No. 124,725

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BRIAN MICHAEL WATERMAN,
*Appellant*.

SYLLABUS BY THE COURT

1.

It is the task of the district court to ensure that a defendant's right to counsel under the Sixth Amendment to the United States Constitution is honored. In order to fulfill this duty, when the district court becomes aware of a possible conflict of interest between an attorney and a defendant charged with a felony, the court has a duty to inquire further. If an appropriate inquiry is made, the district court's decision is reviewed under an abuse of discretion standard. But a district court abuses its discretion when it makes no inquiry into the nature of the conflict.

2.

When a defendant is denied the assistance of counsel at a critical stage of the criminal proceedings, prejudice to the defendant is presumed.

3.

The Kansas Supreme Court has held that an uncounseled misdemeanor conviction obtained in violation of the defendant's Sixth Amendment right to counsel may not be collaterally used for sentence enhancement in a subsequent criminal proceeding.

1

4.

Under the facts of this case, when a defendant convicted of a felony at trial files a timely pro se motion for new trial alleging ineffective assistance of trial counsel and the district court fails to appoint conflict-free counsel to assist the defendant in arguing the motion, we must remand for the district court to hold a new hearing with conflict-free counsel appointed to argue the motion. If on remand the district court denies the motion, finding no ineffective assistance of counsel, a new trial is unnecessary. But if the district court grants the motion, finding ineffective assistance of counsel, a new trial must be held and trial counsel appointed.

Appeal from Cherokee District Court; ROBERT J. FLEMING, judge. Oral argument held September 19, 2023. Opinion filed November 22, 2023. Affirmed in part, reversed in part, sentence vacated, and case remanded with directions.

*Ethan Zipf-Sigler*, of Zipf-Sigler Law Office, LLC, of Shawnee, for appellant, and *Brian Michael Waterman*, appellant pro se.

*Natalie Chalmers*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before COBLE, P.J., MALONE and WARNER, JJ.

MALONE, J.:  A jury convicted Brian Michael Waterman of attempted first-degree murder, aggravated kidnapping, and aggravated burglary after he stormed into the home of Bob Hopkins and repeatedly stabbed him. Waterman and his appointed appellate attorney have both filed briefs, alleging many errors at trial and during his sentencing. They challenge his convictions and the sentence he received, arguing:

(1) the State presented insufficient evidence to support his aggravated kidnapping conviction;

2

(2) the district court erred by excluding witnesses he intended to call in his defense;

(3) the district court violated his right to confrontation by permitting the State to use the preliminary hearing testimony of his victim, who died before the trial;

(4) the district court erred by refusing to give an instruction on criminal restraint as a lesser included offense of aggravated kidnapping;

(5) the district court erred in denying his motion to dismiss based on the State's access to confidential attorney-client communications;

(6) the district court abused its discretion in denying his motion to appoint substitute counsel;

(7) cumulative error deprived him of his right to a fair trial;

(8) he received an illegal sentence because the district court miscalculated his criminal history score;

(9) the district court abused its discretion by failing to ask about potential biases held by jurors;

(10) his right to due process was violated because the State introduced perjured testimony; and

(11) the district court erred by denying his posttrial motion for mistrial alleging ineffective assistance of counsel.

We have reviewed the record on appeal consisting of 40 volumes and over 2,700 pages of documents, transcripts, and exhibits. The parties agree that Waterman received an illegal sentence due to the improper use of an uncounseled misdemeanor in calculating his criminal history score. As for the claims affecting Waterman's convictions, we find only one reversible error: Waterman was denied the appointment of conflict-free counsel to argue his motion for new trial alleging ineffective assistance of counsel. As a result, we remand the case for the district court to appoint new counsel to represent Waterman on the posttrial motion and for further proceedings consistent with this opinion.

FACTUAL AND PROCEDURAL BACKGROUND

*A near fatal stabbing*

In the early evening hours of May 8, 2016, Bob was at home, sitting in his recliner and enjoying a drink, when a man appeared at his door. Bob's door was always open, weather permitting, and he asked the man, "[C]an I help you?" The man, whom Bob did not know but recognized as a relative of one of his neighbors, responded, "I'm here to kill you." The intruder would later be identified as Waterman. Bob told Waterman to leave, but he did not; instead, Waterman stepped in the room, locked the door behind him, and stabbed Bob in the chest, sides, and back with a pocketknife. After stabbing Bob 17 times, Waterman began pouring bleach over his head and spraying him with bug spray.

Not long after the attack began, Bob's son, Dwayne Hopkins, came home and went to check on his father. He was surprised to find that the door to Bob's place was not only closed but locked. He called out to his father, who responded in a weak and tired voice, "[J]ust a moment." Once the door opened, Dwayne walked in the one-room residence and saw Bob propped up in his bed. The door then shut behind him and he turned around to see Waterman. Dwayne asked him, "[W]hat are you doing?" and Waterman replied, "I'm here to watch him bleed out." Confused, Dwayne turned back to look at his father and noticed that Bob was covered in blood. He then realized that Waterman, whose hand was in his pocket, was probably holding a weapon. Dwayne knew he needed to escape and call an ambulance as quickly as possible, so he fled past Waterman and was able to tell his neighbor to call an ambulance. By the time he looked back, he saw Waterman leaving his father's residence, heading toward the train tracks.

Several paramedics and police officers soon arrived on the scene. They immediately noted the strong smell of bleach and the blood splattered all over Bob's room. Despite his injuries, Bob remained awake and coherent. He told the officers that he

4

did not know the name of the man who had stabbed him but knew what he looked like. When the officers asked about the man's motive, Bob told them the attacker had accused him of "messing around with his daughter." Dwayne also provided a description of Waterman—he noted that he thought his name was either Brian or Ryan and that he was related to a woman named Judy Bossolono. Bossolono would later confirm Waterman's identity, telling police that Waterman had told her that he would attack Bob and that he was likely going to flee to Oklahoma.

Once the paramedics got Bob bandaged, they took him to the hospital where the trauma surgeon treated his wounds, several of which were potentially fatal, including two punctures of his heart and one to his lung. At some point while Bob was in the emergency room, he suffered a cardiopulmonary arrest and lost all vital signs. Luckily, the doctors stabilized him, and Bob survived the ordeal.

After Waterman fled Bob's home, he managed to get a ride from a nearby stranger who drove him to the house of a friend. But upon finding out that Waterman may have been involved in the attack on Bob, the friend kicked Waterman out and alerted police. At that point, Waterman fled to Oklahoma, where he was soon apprehended by local law enforcement and returned to Kansas.

*Pretrial proceedings in district court*

The State initially charged Waterman with one count of attempted first-degree murder, one count of aggravated kidnapping, one count of aggravated battery, and one count of aggravated burglary. At the preliminary hearing, held on February 24, 2017, the State called both Bob and Dwayne to testify. Waterman's counsel cross-examined both men, but the district court restricted questioning about whether Bob was suffering from dementia. That said, Waterman's counsel still elicited testimony that Bob was having

5

trouble remembering things following the attack and did not recall the details of the night. After hearing the evidence, the district court bound Waterman over for trial.

Over the following years, Waterman proceeded to have conflicts with each of the many attorneys appointed to represent him and repeatedly requested continuances of his trial date. Waterman's first appointed attorney, Candace Brewster Gayoso, withdrew before the preliminary hearing. Steven Stockard represented Waterman at his preliminary hearing and also filed a notice of defense of lack of mental state on Waterman's behalf. Stockard then withdrew in February 2018, after requesting two continuances of the trial. Robert Myers was appointed after Stockard withdrew; he requested another continuance of the trial and withdrew a month after he was appointed. The court then appointed Forrest Lowry to represent Waterman, but Waterman promptly requested his removal, and the court appointed Sara Beezley. When Beezley began her representation, she realized that Lowry had turned Waterman's casefile into the State upon his withdrawal, and she was informed that the county attorney intended "to go through the box." Beezley promptly moved to dismiss on Waterman's behalf, alleging confidential attorney-client communications and trial strategy related materials were contained within his file. After the file was returned, Waterman would claim that certain materials were missing.

At the hearing on the motion to dismiss, Waterman expressed concerns that he was being deprived of a fair trial because the State had examined confidential communications that he had with his attorneys about his intended defense. He also broadly alleged that the State and his prior attorneys were all conspiring against him. The State countered that it had not reviewed any confidential materials and merely went through the box to ensure that Beezley received the entire discovery in the case. A legal assistant from the county attorney's office testified that she initially thought Waterman's casefile was just discovery materials, but soon noticed that it also contained attorney-client communications. She asserted that she placed all such communications facedown and did not review them, nor did anyone else in the county attorney's office.

6

After hearing the evidence, the district court denied Waterman's motion to dismiss, explaining that while the State could have handled the matter more carefully, there was no evidence that it had actually reviewed Waterman's confidential communications or that he would suffer any prejudice from the State's actions. Waterman also moved to disqualify the lead prosecutor on the same grounds, which the district court denied. Once the motions were denied, Beezley withdrew as Waterman's counsel. The district court then appointed Frederick Smith to represent Waterman, but he withdrew after representing Waterman at one hearing. The district court then appointed James Campbell, who would be the final attorney assigned to Waterman's case.

A few months into Campbell's representation, Waterman asserted his desire to proceed pro se, but he soon changed his mind while trying to argue several motions at a pretrial hearing. The district court then reinstated Campbell. But as Campbell resumed his representation, Waterman began to accuse him of providing ineffective assistance of counsel and working on behalf of the State. At that point, Campbell requested to withdraw, but Waterman clarified that he was not asking to resume representing himself or for Campbell to withdraw. The district court ordered Campbell to continue his representation, and Campbell requested the court order a competency evaluation, which the court granted. The district court later found Waterman competent to stand trial.

Waterman later filed motions requesting substitute counsel. Campbell also filed a motion requesting the district court to grant his withdrawal. At a hearing on the motions, Campbell stated that Waterman did not believe he was working in his best interests and that there had been a breakdown in communications between Waterman and Campbell. The district court noted that Campbell had a sterling reputation as a criminal defense attorney and explained that Waterman had been provided several attorneys and expressed doubts about finding another attorney to represent him. In response to the district court's hesitation to appoint a new attorney, Waterman claimed that he was suing Campbell in federal court, although the record is unclear whether any action had been filed. The

7

district court took the matter under advisement and contacted Board of Indigents' Defense Services (BIDS) about the possibility of finding another attorney. The district court later denied the motions, explaining that the mere fact that Waterman refused to get along with Campbell—or any of his prior attorneys—was not a sufficient reason to grant the motion.

*Trial and sentencing*

Finally, on November 16, 2021, the trial began on charges of attempted first-degree murder, aggravated kidnapping, and aggravated burglary. Unfortunately, after surviving Waterman's attack, Bob had died before the case proceeded to trial. Accordingly, the State sought to use his testimony from the preliminary hearing. The district court permitted the use of Bob's prior testimony over Waterman's objection that its use would violate his rights under the Confrontation Clause because he had not been given a full opportunity to cross-examine Bob during the preliminary hearing.

Along with presenting Bob's preliminary hearing testimony and Dwayne's testimony, the State called over a dozen other witnesses and introduced over 40 exhibits at trial. One witness, Rick Mayberry, recalled seeing Waterman on the afternoon of the attack and being concerned with his behavior. Mayberry testified that Waterman told him that he was going to "take care of some things" and then flee the state. Waterman also borrowed Mayberry's phone to text Waterman's ex-wife, T.B., about his plans. In the message, Waterman told T.B. that he would be "taking care" of the man who had touched their daughter. T.B. testified and explained that two years before the attack, Waterman and T.B.'s daughter, A.W., had confided that A.W. thought she had been touched by an old man—she did not reveal the man's name, although Waterman came to believe the man was Bob. T.B. also testified that Waterman had sent her letters from jail before the trial in which he described feeling justified in his actions because of what the man had done to their daughter. The State also called Dr. David Baker, a trauma surgeon who had

8

treated Bob for his knife wounds. Dr. Baker described the severity of the wounds and the fact that some wounds were potentially fatal.

Waterman testified in his defense. Waterman admitted stabbing Bob but testified that he had not wanted to kill him. Waterman asserted that he was driven to a rage when Bob not only admitted to touching his daughter but then told him that she had "liked it." On the second day of trial, Waterman's counsel proposed that he planned to call a psychologist, Dr. Mitchell Flesher, to testify about Waterman's various mental health issues and how they influenced his behavior on the night of the attack. The State objected and argued that any evidence about Waterman's mental health conditions was irrelevant and inadmissible because Dr. Flesher had concluded that none of Waterman's conditions were debilitating enough to negate his criminal intent. The district court agreed with the State and excluded Dr. Flesher's testimony. Waterman also sought to call his daughter, A.W., and another woman to testify that Bob had sexually abused them. The district court excluded the testimony on the grounds that it was irrelevant to the issues at trial and would not constitute a defense to the charges.

The district court instructed the jury on the charges including the lesser offenses of attempted second-degree murder and attempted voluntary manslaughter. The district court denied Waterman's request for an instruction on criminal restraint as a lesser offense of aggravated kidnapping. After considering the evidence and the closing arguments, the jury found Waterman guilty as charged on all counts.

Following the trial, Waterman filed a pro se "Motion for Mistrial for Ineffective Assistance of Counsel." In his motion, Waterman argued that a mistrial was required for his attorney's deficient performance. He argued that Campbell should have presented more evidence on the varying sizes of the knife wounds (which he alleged suggested that Dwayne had stabbed Bob after he did) and that Campbell did not sufficiently impeach the credibility of Bob and Dwayne's testimony. Campbell also moved for a new trial on

9

Waterman's behalf based on violation of court orders relating to the treatment of Waterman during the trial and for improper contact between the jurors and law enforcement. Waterman later filed a formal ethical complaint against Campbell with the Disciplinary Administrator's office and named him as a party in a federal lawsuit, causing Campbell to again move to withdraw from the case due to a conflict.

At a hearing on the posttrial motions, the district court first addressed Campbell's motion to withdraw. Campbell told the court that because of the complaint Waterman filed against him, "I believe that I am ethically required to request the Court permission to withdraw as representation for Mr. Waterman." The district court responded by asking Campbell whether he could "set that aside and argue this motion for a new trial." Campbell replied, "I dispute the allegations that he filed in his motion for ineffective assistance. I dispute what he alleged in the disciplinary complaint. I'm going to continue to zealously advocate for my client so long as I am his attorney in the case." After some additional discussion, the district court denied Campbell's motion to withdraw.

Next, the district court addressed Waterman's pro se motion for a mistrial. Without asking Campbell whether he could argue the motion on Waterman's behalf, the district court simply asked Waterman if he was ready to proceed with his motion. Waterman argued his motion and explained his dissatisfaction with Campbell due to his failure to impeach Bob and Dwayne and his belief that Campbell provided poor representation in retaliation against him. He focused his argument on Campbell's failure to highlight the different sizes of the knife wounds Bob suffered. The State responded that it believed Campbell had provided effective representation and refuted Waterman's claim that evidence about the size of the knife wounds would have exonerated him.

In making its ruling, the district court noted that although Waterman had framed parts of his argument as an ineffective assistance of counsel claim under K.S.A. 60-1507, he was arguing for a mistrial. The district court disagreed with Waterman's contention

10

that Campbell was ineffective, explaining: "I can tell you I thought Mr. Campbell did a very effective job of cross-examining Dwayne Hopkins." Ultimately, the district court concluded: "So I'm going to deny your motion. I think you were provided with very effective assistance of counsel. Unfortunately for you, you had bad facts."

The district court next addressed Campbell's motion for new trial. Campbell argued many points covered in the written motion and introduced exhibits without objection from the State to support one of the issues. After hearing the State's response, the district court denied the motion for new trial.

At the sentencing hearing on January 4, 2022, the parties disagreed on Waterman's criminal history score due to the aggregation of several prior misdemeanors—the State asserted it was C and Waterman contended it should be F. The district court sided with the State and determined Waterman's criminal history score was C. The district court sentenced Waterman to 285 months' imprisonment for attempted first-degree murder, 155 months' imprisonment for aggravated kidnapping, 32 months' imprisonment for aggravated burglary, and it ran the attempted murder and aggravated kidnapping sentences consecutive for a controlling sentence of 440 months' imprisonment. Waterman timely appealed the district court's judgment.

DID THE STATE PRESENT SUFFICIENT EVIDENCE
TO SUPPORT WATERMAN'S AGGRAVATED KIDNAPPING CONVICTION?

Waterman asserts that the State presented insufficient evidence to support his aggravated kidnapping conviction because—under *State v. Buggs*, 219 Kan. 203, 547 P.2d 720 (1976)—the State failed to show that any confinement of his victim occurred separate and distinct from the actions that supported his attempted first-degree murder conviction. The State responds that Waterman's argument is misplaced because the Kansas Supreme Court has held that *Buggs* does not apply to the subsection of the

11

aggravated kidnapping statute under which Waterman was charged. See *State v. Burden*, 275 Kan. 934, 69 P.3d 1120 (2003). After briefing, the State filed a Supreme Court Rule 6.09 (2023 Kan. S. Ct. R. at 40) letter of additional authority asserting that the holding in *Burden* was reaffirmed in *State v. Butler*, 317 Kan. 605, 533 P.3d 1022 (2023).

When presented with a challenge to the sufficiency of evidence to support a conviction, this court must decide whether—when reviewing the evidence in the light most favorable to the State—it is convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. In making this inquiry, an appellate court will not reweigh evidence, resolve evidentiary conflicts, or reassess witness credibility. *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021).

The State alleged that Waterman committed aggravated kidnapping by confining his victim "by force, threat, or deception and with the intent to hold said person to inflict bodily injury or to terrorize the victim" and that bodily harm was inflicted upon the person who was kidnapped. The language in the charging document mirrors that found in K.S.A. 2022 Supp. 21-5408(a)(3), along with the element of the infliction of bodily harm found in K.S.A. 2022 Supp. 21-5408(b). Waterman focuses his argument on the "confinement" element of the offense. He asserts that because any confinement of Bob was incidental to his commission of attempted first-degree murder "the evidence at trial did not support a separate conviction for aggravated kidnapping."

To support his sufficiency argument, Waterman cites *Buggs*, 219 Kan. at 214-17, which restricted the meaning of the term confinement in the context of the crime of kidnapping when the alleged confinement was committed in facilitation of another crime. The *Buggs* court held that a confinement must "not be slight, inconsequential and merely incidental to" or "of the kind inherent in the nature of the other crime." 219 Kan. at 216. Rather, the confinement "[m]ust have some significance independent of the other crime in that it makes the other crime substantially easier [to commit] or substantially lessens

12

the risk of detection." 219 Kan. at 216. But the Kansas Supreme Court later clarified that the *Buggs* test only applied to those cases where the State alleged that the victim was confined with the intent to facilitate the commission of another crime—this subsection is found in K.S.A. 2022 Supp. 21-5408(a)(2). *Burden*, 275 Kan. 934, Syl. ¶ 3. And as the State points out, the *Burden* court's holding recently has been upheld by the Kansas Supreme Court in *Butler*, 317 Kan. 605.

Because Waterman was charged under section (a)(3) of the kidnapping statute, and not under section (a)(2), the *Buggs* test has no application, and we need only proceed under the typical sufficiency-of-the-evidence standard to determine whether the evidence the State presented at trial could support Waterman's aggravated kidnapping conviction. To prove Waterman guilty of aggravated kidnapping beyond a reasonable doubt, the State had to prove that he confined Bob with the intent "to inflict bodily injury or to terrorize the victim or another," plus the added element that Waterman inflicted bodily harm on Bob. See K.S.A. 2022 Supp. 21-5408(a)(3) and (b).

Viewed in the light most favorable to the State, there was sufficient evidence to show that Waterman confined Bob with the intent to inflict bodily injury on him. Bob's testimony established that Waterman came into his house, locked the door, and told him that he was there to kill him before he proceeded to continually stab him. Bob's son, Dwayne, confirmed that the door to Bob's residence was shut and locked when he went to check on his father, which was abnormal because Bob usually left his door open until he went to bed. Dwayne described knocking on the door and calling out to his father until the door then opened. Before Dwayne even noticed his father's stab wounds, Waterman told him, "'I'm here to watch him bleed out.'" For his part, Waterman did not directly testify about whether he had closed and locked the door when he entered Bob's residence—he did state that Dwayne simply walked in, not that he opened the door for him. In any event, this court cannot reweigh the evidence presented to the jurors, who were entitled to credit or discredit Bob and Dwayne's testimony that Waterman locked

13

the door. See *State v. Kettler*, 299 Kan. 448, 471, 325 P.3d 1075 (2014). Thus, the State presented sufficient evidence that Waterman confined Bob before stabbing him and dumping bleach on him. We conclude that a rational fact-finder could have found beyond a reasonable doubt that Waterman was guilty of aggravated kidnapping.

## DID THE DISTRICT COURT ERR BY EXCLUDING CERTAIN WITNESSES?

Waterman argues the district court erred by excluding testimony from (1) a treating psychologist about his mental conditions and (2) two witnesses who alleged that Bob had committed acts of sexual abuse against them. He asserts that by excluding these crucial witnesses the district court violated his right to present his chosen defense. The State counters that the district court properly excluded the evidence Waterman sought to admit, and, even if the testimony were relevant, any error was harmless.

While criminal defendants have a right to present relevant evidence to support their theory of defense under both the federal and Kansas Constitutions, that right is subject to reasonable restrictions. *State v. Frantz*, 316 Kan. 708, 720-21, 521 P.3d 1113 (2022) (quoting *United States v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 [1998] ["(S)tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."]). Rules of procedure and evidence are designed to assure both fairness and reliability in the ascertainment of guilt and innocence, and therefore must be abided. *Frantz*, 316 Kan. at 721. Thus, a criminal defendant's fundamental right to a fair trial is only violated where "'relevant, admissible, and noncumulative evidence which is an integral part of the theory of the defense is excluded.'" *State v. Roeder*, 300 Kan. 901, 927, 336 P.3d 831 (2014). Whether a defendant was denied their constitutional right to present a defense by the exclusion of evidence is a question of law subject to unlimited review. *State v. White*, 316 Kan. 208, 212, 514 P.3d 368 (2022).

When examining issues about the admission or exclusion of evidence, an appellate court must first consider whether the evidence was relevant. *State v. Levy*, 313 Kan. 232, 237, 485 P.3d 605 (2021). Relevant evidence must be both material—meaning it has some real bearing on the decision in the case—and probative—meaning it tends to prove a material fact. *State v. Alfaro-Valleda*, 314 Kan. 526, 533, 502 P.3d 66 (2022). Whether a piece of evidence is material presents a question of law, which this court considers under a de novo standard of review; whether evidence is probative is reviewed for an abuse of discretion. 314 Kan. at 533. "'Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question.'" *Roeder*, 300 Kan. at 927.

*Proposed testimony of Dr. Flesher*

Waterman first contends that Dr. Flesher, who performed psychological evaluations on him, should have been permitted to testify as an expert regarding the effect of his various mental health conditions on his ability to form the requisite intent to commit the crimes charged. He argues: "Doctor Flesher's testimony was critical in the defense's theory that [his] intention was not to commit a crime or to kill [Bob] when he went in to confront him that day." The State asserts Dr. Flesher's testimony was irrelevant and properly excluded by the district court under K.S.A. 2022 Supp. 21-5209, the statute governing the defense of lack of mental state. Issues involving a district court's admission or exclusion of expert testimony offered under the mental disease or defect statute are reviewed de novo. *State v. Pennington*, 281 Kan. 426, 433-34, 132 P.3d 902 (2006).

Waterman filed a notice of his intent to assert a defense based on his alleged disease or defect, under K.S.A. 22-3219, to support his defense that he could not form the requisite intent to commit the crimes. At trial, Waterman's counsel stated that he intended to call Dr. Flesher to testify because to receive an instruction on "an imperfect mental

15

health defense," Waterman needed to present testimony from an expert who evaluated him. The district court initially ruled that it would permit Dr. Flesher's testimony and that the State could raise objections once he was on the stand.

But the next day, the State filed a motion in limine, alleging Dr. Flesher's testimony was inadmissible. The State's motion relied on two cases: *State v. McLinn*, 307 Kan. 307, 319, 409 P.3d 1 (2018), which held that premeditation is not a culpable mental state that can be negated by the mental disease or defect defense under K.S.A. 2013 Supp. 21-5209, and *Pennington*, 281 Kan. at 435-36, which held that evidence of the existence of mental disease or defects must relate to the defendant's ability to possess the required intent for the crimes charged. After hearing the parties' arguments, the district court ruled that Dr. Flesher would not be permitted to testify at trial but that his testimony could be presented as mitigating evidence during sentencing if Waterman were convicted.

Before addressing the grounds of the district court's ruling, we observe that Waterman's argument about Dr. Flesher's proposed testimony does not square with the substance of his report. While Waterman correctly states that Dr. Flesher found that he suffered from "various mental health issues," Waterman's assertion at the motion in limine hearing that Dr. Flesher had determined that he was "potentially incapable of forming the intent necessary for him to be found guilty" is not supported by Dr. Flesher's written report. In his report, Dr. Flesher found that Waterman suffered from several mental disorders—such as psychosis, paranoia, persecutory beliefs, substance abuse disorder, and manic and impulsive behavior. But he still concluded:

> "Based on his statements to others prior to the offense, his present recollection of the offense, and his behavior following the offense, it appears that Mr. Waterman did not, due to mental disease or defect, lack the ability to form the intent required as an element of the offense.
>
> . . . .

16

"It is likely that those conditions strongly influenced his behavior at the time of the offense, but based on his actions prior to, during, and after the offense, the conditions did not result in such confusion or disorientation as to negate his criminal responsibility under Kansas law."

K.S.A. 2022 Supp. 21-5209 states: "It shall be a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the culpable mental state required as an element of the crime charged. Mental disease or defect is not otherwise a defense." To prove Waterman guilty of all three charged crimes, the State was required to prove three different culpable mental states: (1) for attempted premeditated murder, that he intended to kill Bob; (2) for aggravated kidnapping, that he intended to inflict bodily harm or to terrorize Bob; and (3) for the aggravated burglary, that he intended to commit a felony when he entered Bob's residence. Thus, for any evidence of Waterman's alleged mental defects to constitute a viable defense, it would have to show that because of a mental disease or defect, he lacked the intent required as an element of the three charged crimes. See *Pennington*, 281 Kan. at 434.

Dr. Flesher did not believe that Waterman's mental defects precluded him from forming the requisite intent to commit any of the charged crimes. Although Dr. Flesher outlined his belief that Waterman's intoxication, prior methamphetamine use, and bipolar disorder "likely . . . strongly influenced his behavior at the time of the offense," he concluded that, in his opinion, those factors did not "negate [Waterman's] criminal responsibility under Kansas law."

Waterman's case is similar to *Pennington*. There, a psychologist performed two examinations and found that the defendant suffered from mental defects, but still stated that the defendant could form the intent necessary to commit his crimes. The *Pennington* court upheld the district court's exclusion of the expert's testimony to support a mental disease or defect defense reasoning that the testimony was irrelevant because the expert's

17

opinion was that the defendant had the ability to form the criminal intent required to commit the crimes charged—despite any disease or defect he may have suffered. 281 Kan. at 432, 441. The same rationale applies here. Although Dr. Flesher's report shows that Waterman suffered from various mental diseases or defects at the time of the offense, Dr. Flesher made clear that those ailments did not prevent Waterman from forming the requisite criminal intent to commit the charged crimes.

"'Relevant evidence' means evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). To be relevant, evidence of Waterman's mental ailments would need to tend to show that they prevented him from forming (1) the intent to kill Bob, (2) the intent to inflict injury or terrorize Bob by confining him, or (3) the intent to commit a felony inside Bob's house. Dr. Flesher's expert opinion does not support such a conclusion—it supports the exact opposite. Dr. Flesher explained that despite his distorted perceptions and impaired judgment, the conditions that Waterman suffered did not cause sufficient confusion or disorientation to negate his ability to form the requisite criminal intent. Thus, any evidence that Waterman was suffering from various mental conditions was not relevant to a determination of whether he committed attempted premeditated murder, aggravated kidnapping, or aggravated burglary. We conclude the district court did not err in excluding Dr. Flesher's expert testimony about Waterman's mental disorders because such evidence failed to meet the standard in K.S.A. 2022 Supp. 21-5209.

*Proposed testimony of A.W. and C.H.*

Next, Waterman argues that the district court erred when it excluded testimony of A.W. and C.H., both of whom would have testified that Bob had sexually abused them years earlier. He asserts their testimony was relevant because it would have challenged the credibility of Bob, and Dwayne and would "support [his] mental state at the time he entered the house." He also asserts that A.W.'s testimony would have corroborated his

18

claim that he acted in a heat of passion when Bob said that A.W. "liked" the abuse. The State again maintains the evidence was properly excluded because it was not relevant.

At trial, Waterman informed the court that he intended to call both A.W. and C.H. to testify about being abused by Bob, but the district court excluded such testimony on the ground of relevance, noting that whether Bob was a sexual abuser was not a defense to Waterman's actions. Although Waterman was not permitted to call A.W. and C.H. as witnesses, he was still able to introduce evidence about Bob allegedly molesting his daughter. Waterman personally testified that he only stabbed Bob after he admitted touching A.W., and Waterman's ex-wife, T.B. described A.W. telling her—two years before the attack—that an old man had touched her.

The proposed testimony of A.W. and C.H. had little or no relevance to the trial. Neither A.W. nor C.H. were at the scene of the attack and their alleged abuse occurred years before the attack. Waterman was allowed to present evidence of his belief that Bob may have molested A.W. to establish his intent in confronting Bob. Whether Bob was guilty of actually molesting A.W. was immaterial. For the same reason, Waterman did not need A.W.'s testimony to corroborate his claim that he acted in a heat of passion when Bob said that A.W. "liked" the abuse. Assuming there was any relevance to A.W.'s proposed testimony, it would have been cumulative to the evidence Waterman was permitted to introduce on the subject. The proposed testimony of C.H. was even less relevant as there was no evidence that Waterman knew about this alleged abuse.

Waterman's blanket assertion that the testimony would have cast doubt on Bob's credibility is also unconvincing. While Bob denied abusing, or even knowing A.W., he told the responding officers that Waterman had stabbed him because Waterman believed that he had touched his daughter. Likewise, the testimony of A.W. and C.H. had no bearing on Dwayne's credibility—he testified that he was unaware of any allegations against Bob. The district court properly excluded the testimony of A.W. and C.H.

19

because evidence of Bob's alleged abuse was not relevant before the jury and would not have impeached the credibility of the witnesses against Waterman. We need not address the State's argument that any error in the exclusion of this testimony was harmless.

DID THE DISTRICT COURT VIOLATE WATERMAN'S RIGHT TO CONFRONTATION?

Waterman next contends that his right to confrontation was violated when the district court admitted Bob's preliminary hearing testimony at trial after his death. Although Waterman was present at the preliminary hearing and was represented by counsel (who cross-examined Bob at that time), he still asserts that this prior cross-examination was constitutionally inadequate because the district court restricted his questioning about any disorders that may have affected Bob's memory of the events. The State counters that Waterman's argument is meritless because he could delve into Bob's general memory issues, just not his alleged medical conditions.

The Sixth Amendment's Confrontation Clause provides that an accused "shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend VI; see also *Pointer v. Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965) (holding Sixth Amendment's Confrontation Clause binds States through the Fourteenth Amendment). In *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), the United States Supreme Court held the Sixth Amendment right to confrontation provides that testimonial hearsay statements are inadmissible unless the declarant is unavailable to testify, and the defendant was afforded a prior opportunity to cross-examine the declarant. We review a claim that a defendant's right to confrontation was violated de novo. *State v. Stano*, 284 Kan. 126, 139, 159 P.3d 931 (2007).

The Kansas Supreme Court has explained the contours of a defendant's rights under the Confrontation Clause as follows:

20

"[T]his court has not indicated that a defendant must have the opportunity to cross-examine a witness as to every allegation that may arise during the course of a trial in order to protect his constitutional rights under the Confrontation Clause. Previous Kansas cases recognize that there may be details at trial that have not been the subject of cross-examination in prior proceedings. As this court explained in [*State v.*] *Terry*, [202 Kan. 599, 451 P.2d 211 (1969)] '[t]his exception [of admitting preliminary hearing testimony] has been explained as arising from practical necessity and justified on the ground that the right of cross-examination initially afforded provides substantial compliance with the purposes behind the confrontation requirement.' 202 Kan. 599, Syl. ¶ 3." *Stano*, 284 Kan. at 144.

In *State v. Noah*, 284 Kan. 608, 613, 162 P.3d 799 (2007), the Kansas Supreme Court squarely addressed the question of what constitutes a constitutionally adequate opportunity for cross-examination. The *Noah* court explained that a defendant must be given the *opportunity* to conduct cross-examination but noted that a district court may still impose reasonable limits on defense counsel's questioning—"'"[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."' [Citation omitted.]" 284 Kan. at 616 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 [1986]). Ultimately, the *Noah* court concluded the determination of whether the opportunity for cross-examination was sufficient is a case-by-case basis inquiry and depends on the type and extent of limitations placed on the defendant's cross-examination. 284 Kan. at 616-17.

Waterman had the opportunity to cross-examine Bob at the preliminary hearing. Waterman's cross-examination focused on Bob's poor memory, including his difficulty remembering the details of the attack, his inability to recall what happened in the months following the stabbing, and his failure to recall giving a statement to the police. But the State objected when Waterman's counsel questioned whether Bob knew "what the term dementia means." The State argued that there was no foundation to question Bob about

dementia and that he was not a medical expert on the subject. The district court sustained the State's objection, to which Waterman's counsel asked whether he would be permitted "to examine [Bob's] medical condition that may affect his memory concerning these events," and asserted, "I'm just trying to make a record of any medical condition that he has that may affect his ability to recall." The district court clarified that it was permitting questions about what Bob could remember, but it would not allow questions about Bob's specific medical condition because they were more properly raised to Bob's doctor.

Despite the district court's limitation on asking about Bob's medical conditions, Waterman probed the credibility of Bob's version of events through his admitted inability to remember the particulars of the night of the incident. Through Waterman's cross-examination, he established that Bob forgot what he had done on the day of the attack. Bob also admitted that he forgot the timeline of events, nor did he remember exactly what Waterman told him other than that he said, "I'm here to kill you." Finally, Bob described going "blank" sometime during the attack and that the next thing he remembered was being in a nursing home, six months later. In short, the record from the preliminary hearing, which was eventually read to the jury during trial, displayed that Bob had severe memory issues—regardless of whether he suffered from a medical condition. Thus, to the extent that Waterman contends the district court disallowed inquiry into issues of Bob's memory, and therefore his credibility about the stabbing, his argument fails.

The sole line of inquiry the district court denied to Waterman during his cross-examination was whether Bob suffered from a medical condition such as dementia. While Waterman's cross-examination was restricted, he was not prevented from probing Bob's memory of the events. The district court also did not deprive Waterman of the opportunity of introducing evidence about whether Bob suffered from dementia at a later date. Waterman could have questioned Bob's doctor about any possible medical issues impacting Bob's cognitive abilities or called him at trial, but he did not do so. The record shows that Waterman could ask detailed questions about Bob's memory and recollection

22

of events, even if he could not confirm whether Bob suffered from dementia. As such, we conclude that Waterman had an opportunity for effective cross-examination of Bob at the preliminary hearing sufficient to satisfy the requirements of the Confrontation Clause.

## DID THE DISTRICT COURT ERR IN FAILING TO GIVE AN INSTRUCTION ON CRIMINAL RESTRAINT?

Waterman next argues the district court erred by not giving an instruction on criminal restraint as a lesser included offense of aggravated kidnapping. Interestingly, Waterman did not seek an instruction for the lesser offense of kidnapping, but he requested an instruction for the lesser offense of criminal restraint. The State responds that an instruction on criminal restraint was legally appropriate and "may have been" factually appropriate, but any error in not giving the instruction was harmless.

This court analyzes claims of jury instruction errors using a three-step process to determine whether: (1) there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) the instruction was factually and legally appropriate; and (3) any error requires reversal. *State v. Crosby*, 312 Kan. 630, 638-39, 479 P.3d 167 (2021). Here, Waterman requested the district court provide a jury instruction on criminal restraint. As such, if this court finds that the court erred in not giving the instruction, it must determine whether the error was harmless—that is, whether there is no reasonable possibility that the error contributed to the verdict. *State v. Holley*, 313 Kan. 249, 256-57, 485 P.3d 614 (2021). The burden is on the State to prove harmless error. 313 Kan. at 257.

Jury instructions on lesser included offenses are generally legally appropriate. *State v. Gentry*, 310 Kan. 715, 721, 449 P.3d 429 (2019). And criminal restraint is a lesser included offense of aggravated kidnapping. *State v. Simmons*, 282 Kan. 728, 742, 148 P.3d 525 (2006). Thus, as both parties agree, a jury instruction on criminal restraint at Waterman's trial would have been legally appropriate. But we observe that in our

23

stepladder approach to instructing the jury on lesser included offenses, the district court would have instructed on criminal restraint only after instructing on kidnapping, and Waterman did not even request an instruction on kidnapping.

Turning to whether a criminal restraint instruction was factually appropriate, a jury instruction for a lesser included offense must be given "[i]n cases where there is *some* evidence which would reasonably justify a conviction of some lesser included crime . . . the judge shall instruct the jury as to the crime charged and any such lesser included crime." (Emphasis added.) K.S.A. 2022 Supp. 22-3414(3). Alongside this statutory directive, Kansas courts have repeatedly held that "[a] district court has a duty to instruct the jury on any lesser included offense established by the evidence, even if that evidence is weak or inconclusive." *State v. Nelson*, 291 Kan. 475, Syl. ¶ 1, 243 P.3d 343 (2010).

For a rational fact-finder to find Waterman guilty of criminal restraint, it would have to find that he "knowingly and without legal authority restrain[ed] another person so as to interfere substantially with such person's liberty." K.S.A. 2022 Supp. 21-5411(a). Waterman argues that a jury instruction on criminal restraint would have been factually appropriate because the evidence on confinement "was minimal" and disputed. He points out there was some evidence that he never locked the door at Bob's residence but even if he did, that level of confinement "was not severe enough to warrant a conviction for kidnapping."

We are not convinced that a jury instruction on criminal restraint would have been factually appropriate here. But if an instruction on criminal restraint would have been factually appropriate, we agree with the State that any error in failing to give the instruction was harmless. The difference between criminal restraint and aggravated kidnapping is that aggravated kidnapping required Waterman to confine Bob by force with intent to hold Bob to inflict bodily injury on him and bodily harm was inflicted on him. The State presented overwhelming evidence that Waterman confined Bob by force

24

to inflict bodily injury on him and, after stabbing Bob 17 times, Waterman stayed in the room "to watch him bleed out." The weight of the evidence presented at trial leaves little doubt that the jury would have convicted Waterman of aggravated kidnapping even if an instruction on criminal restraint had been given. We are comfortable in finding the State has shown there is no real possibility that any error contributed to the verdict. Thus, we conclude that any error in failing to instruct the jury on criminal restraint was harmless.

DID THE DISTRICT COURT ERR IN DENYING WATERMAN'S MOTION TO DISMISS BASED ON THE STATE'S ACCESS TO CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATIONS?

Waterman contends the district court abused its discretion by refusing to dismiss the charges against him because his right to counsel was violated through a breach of his attorney-client relationship by the State's handling of his casefile after it was left with the county attorney's office by his former attorney. He argues that the district court should have at least disqualified the Cherokee County Attorney's Office for the alleged violation. In his pro se brief, Waterman also claims the district court erred in denying his motion to dismiss based on a breach of attorney-client communications. Waterman alleges the State used the confidential communications from his casefile to formulate its trial strategy—he does not provide record citations to support his conclusory allegations. In response, the State argues the district court did not abuse its discretion in denying the motions because the county attorney's office properly dealt with the casefile after realizing it contained confidential materials and its actions did not prejudice Waterman in any meaningful way.

Appellate courts review a district court's decision on whether to dismiss criminal charges for an abuse of discretion. *State v. Bolen*, 270 Kan. 337, 342-43, 13 P.3d 1270 (2000). Similarly, a court's decision on whether to disqualify an attorney is reviewed for an abuse of discretion. This court will only find an abuse of discretion if the district court's ruling was based on an error of fact, an error of law, or if no reasonable person would agree with its decision. *State v. Miller*, 308 Kan. 1119, 1148, 427 P.3d 907 (2018).

25

After finding out that his former attorney had left his casefile with the county attorney's office, Waterman moved to dismiss. He alleged that the casefile contained confidential communications and the State prejudiced his case by failing to promptly return the casefile. His motion asserted a violation of his right to due process, not his right to counsel—although he later moved to suppress and alleged the State's actions violated his rights under the Sixth Amendment to the United States Constitution.

In *Bolen*, the Kansas Supreme Court discussed the standards for dismissing a criminal case based on the State's misconduct. The *Bolen* court noted that while a district court has discretion to dismiss criminal charges, such a ruling should be made with caution, and only when no other remedy will serve the ends of justice. 270 Kan. at 342-43. For the State's actions to merit such a remedy, it must be shown that intentional misconduct occurred, that the misconduct prejudiced the defendant, and that no lesser sanction would suffice. 270 Kan. at 342-43. The United States Supreme Court has similarly found that a mere intrusion into an attorney-client relationship, standing alone, cannot constitute a Sixth Amendment violation. *Weatherford v. Bursey*, 429 U.S. 545, 550-58, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977) ("There being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion[] . . . there was no violation of the Sixth Amendment . . . .").

Waterman contends the district court applied the incorrect standard when addressing the claims within his motion to dismiss, citing several cases in which other jurisdictions have presumed prejudice to a defendant where the State has intruded into the attorney-client relationship. See *Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995); *United States v. Costanzo*, 740 F.2d 251, 254 (3d Cir. 1984); *State v. Bain*, 292 Neb. 398, 418-19, 872 N.W.2d 777 (2016); *State v. Lenarz*, 301 Conn. 417, 435-37, 22 A.3d 536 (2011). But these cases are distinguishable as each centered on *intentional* intrusions into the attorney-client relationship by the government. The facts here do not

support Waterman's claim that the State's actions in handling Waterman's casefile were intentional.

Although Waterman insists that the State nefariously searched his casefile and used his confidential communications to thwart his defense, the record does not support this conclusion. At the hearing, the State presented the testimony of the legal assistant who inventoried the box, believing it to be discovery—she was the sole person in the county attorney's office to handle the casefile. She stated that when she found letters with Waterman's former attorney's letterhead, she did not review them. She also explained that she did not make any copies or documentation of the letters, and simply returned them to the box, which she then provided to Waterman's attorney.

In ruling on the motion to dismiss, the district court implicitly found the State's evidence more credible than Waterman's testimony. The district court found that it was reasonable for the State to assume that Waterman's former attorney had delivered a box of discovery upon his withdrawal from the case and that it was reasonable for the State to ensure that the discovery materials were complete before providing them to Waterman's new counsel. The district court found that Waterman had made no showing that any of the State's attorneys had reviewed the material—the only person in the county attorney's office who went through the casefile was the legal assistant, who upon finding what appeared to be confidential communications quarantined them without review. Finally, the district court found that Waterman had not shown that he was prejudiced in any way by the State's inadvertent receipt of the casefile.

The district court's factual findings are supported by the record. It is undisputed that the State only received the casefile inadvertently when Waterman's former attorney gave it to them. No evidence supports Waterman's claim that the State's actions were intentional or designed to discover Waterman's trial strategies. Waterman could not show that the State's actions prejudiced him in any way. And any potential risk of prejudice at

27

trial was negated by the district court's decision to permit Waterman to raise objections at trial should the State attempt to use any information derived from his confidential communications. After his initial motion to dismiss was denied, Waterman moved to suppress any materials found in his casefile as being obtained in violation of his attorney-client privilege, and in the alternative to dismiss the case. The district judge declined Waterman's request to dismiss the case or make any suppression ruling at that time, but it ruled: "In the event during the trial the State attempts to introduce evidence from your file that you think is prejudicial, you may at that time object, and I will rule on it." Despite this ruling, Waterman raised no such objection during the trial.

Waterman did not provide any communication, transcript, or documentation showing that the State obtained any evidence or content from his casefile, let alone that it used such information. He merely provides conclusory and speculative accusations that the State engaged in intentional and egregious illegal conduct. The record provides no basis from which this court can presume that he suffered any prejudice.

The district court did not abuse its discretion in denying Waterman's motion to dismiss. While the county attorney's office's handling of the casefile after it became clear that there were privileged materials could have been more forthcoming, the record does not support that Waterman suffered any prejudice. Waterman has not shown that the district court's ruling on his motion was based on an error of fact or law, and, considering the extreme remedy Waterman sought, it cannot be said that no reasonable person would agree with the district court's denial of his motion to dismiss.

Waterman also alleges the district court abused its discretion by denying his motions seeking the disqualification of the lead prosecutor. In his motions, he argued that the only way to ensure that the State did not use the private communications and trial strategies found in his casefile was to disqualify the prosecutor. As with his arguments about the denial of his motion to dismiss, Waterman makes conclusory allegations that

are not supported by the record. As noted above, the only person within the county attorney's office that handled Waterman's casefile was a legal assistant. She testified that she did not review any items that she thought could be confidential communications, and that no one else in the office—including the prosecutor whom Waterman argues should have been disqualified—reviewed the materials either. Waterman could object at trial if he believed the State was trying to use any information derived from its exposure to confidential communications, but he raised no objections. The district court did not abuse its discretion by denying the motions to disqualify the prosecutor.

### DID THE DISTRICT COURT ABUSE ITS DISCRETION BY REFUSING TO PERMIT WATERMAN'S TRIAL COUNSEL TO WITHDRAW?

Waterman contends the district court abused its discretion when it denied his pretrial request for new counsel due to a deterioration of his relationship with Campbell, the seventh attorney assigned to represent him. The State asserts that the district court did not abuse its discretion when it refused to permit Campbell to withdraw. The State argues that the district court sufficiently inquired about any conflict and found that the deterioration in the relationship between Waterman and Campbell was not complete.

Both the federal and Kansas Constitutions guarantee indigent criminal defendants the right to effective assistance of counsel. But neither guarantees the right to *choose* which attorney will be appointed to represent him or her. *State v. Breitenbach*, 313 Kan. 73, 90-91, 483 P.3d 448, *cert. denied* 142 S. Ct. 255 (2021). The rules governing a defendant's motion for substitute counsel are well established:

> "'[T]o warrant substitute counsel, a defendant must show "justifiable dissatisfaction" with appointed counsel. Justifiable dissatisfaction includes a showing of a conflict of interest, an irreconcilable conflict, or a complete breakdown in communications between counsel and the defendant. But ultimately, "'[a]s long as the trial court has a reasonable basis for believing the attorney-client relation has not deteriorated to a point where appointed

29

counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel.'"

"Further, when the defendant's dissatisfaction emanates from a complaint that cannot be remedied or resolved by the appointment of new counsel—such that replacement counsel would encounter the same conflict or dilemma—the defendant has not shown the requisite justifiable dissatisfaction. [Citations omitted.]" 313 Kan. at 90-91.

After receiving many substitute counsel appointments, Waterman filed two pro se motions to remove Campbell—the first was titled "Conflict of Interest On Counsel" and the second, "Motion to Recuse James Campbell." Waterman alleged that the attorney-client relationship was no longer workable, and that Campbell was refusing to litigate on his behalf. He also claimed that Campbell was conspiring with the State and the district court to deny him his fundamental rights (an accusation he made against his prior attorneys), and that he had filed a civil complaint against Campbell. Waterman did not ask the district court to allow him to proceed pro se; instead, he insisted that the district court appoint another attorney to represent him in the case. Campbell filed his own motion to withdraw, explaining that he and Waterman had a contentious relationship and that Waterman refused to communicate with him.

The district court held a hearing on the motions. Campbell explained that Waterman did not believe that he was working on his behalf and outlined the difficulties in his representation. The district judge made these comments before taking the matter under advisement:

"Here is the—here is the problem I have. I'm not sure I've got the order correct but I think Mr. Campbell is your eighth attorney, and I know Candace Brewster was the first. I think Robert Myers was the second. I don't know the sequence after that. Steve Stockard was your attorney, Forest Lowry was your attorney, Sara Beezley was your attorney, Rick Smith—and I think I'm leaving out someone. That's because a—and then Mr. Campbell would be seventh and I think you've had eight attorneys.

30

"And just by way of background, and for your information because in your letter to me requesting that Mr. Campbell be recused, you refer to him as Judge Lynch's lawyer, and you say Judge Lynch assigned him.

"That's not the case. If you remember, we were set to try this case, there were 97 jurors I think here ready to be voir dired and we had a meeting in chambers with the State and you and your attorney, Rick Smith, and you were in the same position with Mr. Smith it appears you are in now with Mr. Campbell.

"And so I, at your request, granted a continuance, relieved—let Mr. Smith out of the case. And then I called the lady that was in charge of the Board of Indigent Defense Service, she's since retired, but her name was Patricia Scalia. And I told her that you had, I think, seven attorneys, and there wasn't anybody in Southeast Kansas that I would think would agree to take this. And I just said can you appoint somebody.

"And she called me back later and said I'm going to appoint James Campbell, he's—he has a reputation for being a topnotch trial lawyer and he has experience in dealing with difficult clients and he's tried over 100 jury trials.

"So that's how Mr. Campbell was selected. It didn't have anything to do with Judge Lynch. And I'm concerned now that if I allow him to withdraw, I don't know who I can get to represent you. And so there is a new director at BIDS, and so what I think I'm going to do is take this motion under advisement and contact that person tomorrow . . . ."

The parties reconvened for another hearing two weeks later, and the district court announced its ruling on the motions. The district court began by finding that neither Waterman nor Campbell had established that the issues between them were affecting the quality of Campbell's representation. The district court continued:

"The fact is, from my observations, the defendant has been provided—well, with the last two attorneys he's had, Mr. Campbell and Mr. Smith, both of whom provided, in my judgement, professional and effective assistance. But defendant—I think the problem is he couldn't get along with either of them and apparently couldn't get along with the ones who preceded him.

"And that's—not being able to get along with someone is not grounds to have a— to support your motion, Mr. Waterman, or Mr. Campbell's motion to withdraw.

. . . .

31

"So I find as follows: The fact that defendant refuses to cooperate with Mr. Campbell and aide in his defense is his doing—Mr. Waterman's doing. Mr. Campbell is, from my observation and from what I understand from others, highly qualified. He has to date—and I think would likely in the future—continue to represent Mr. Waterman in a manner and custom consistent with the highest degree of professional norms in the State of Kansas.

"Not one thing about Mr. Campbell's performance in my judgment has adversely affected Mr. Waterman's status in this case to date.

"Now, I'm mindful, Mr. Campbell, of your concerns about ethical issues. I don't know specifically what they are, but, as I indicated, that's just something you will have to deal with.

"Mr. Waterman has already had either seven or eight, I have forgotten, lawyers. And I think it is unlikely that any other lawyer would be—turn out to be satisfactory with you, Mr. Waterman.

"So the bottom line is, Mr. Waterman, your motion to disqualify Mr. Campbell, and Mr. Campbell, your motion to withdraw, are each denied."

On appeal, Waterman insists that (1) the district court failed to make an appropriate inquiry into his concerns about Campbell's continued representation and (2) he established a breakdown in communication and Campbell had a conflict of interest because he had filed a complaint and a civil suit against him. We review a claim that a district court erred by refusing to appoint new counsel to a criminal defendant for an abuse of discretion. *Breitenbach*, 313 Kan. at 90. The defendant bears the burden of showing an abuse of discretion. *State v. Hulett*, 293 Kan. 312, 319, 263 P.3d 153 (2011).

Waterman's adequacy-of-the-inquiry argument focuses on his contention that the district court allegedly neglected to address the potential conflict and communication breakdown between himself and Campbell. He contends that the district court refused to allow him to present evidence during the hearing and did not inquire into the nature of the disciplinary complaint or lawsuit he filed against Campbell.

32

If a defendant provides an articulated statement of attorney dissatisfaction, the district court has a *duty* to make an inquiry into the matter to ensure the defendant's right to counsel is honored. *State v. Brown*, 300 Kan. 565, 575, 331 P.3d 797 (2014). "A district court abuses its discretion if it becomes aware of a potential conflict of interest between a defendant and his or her attorney but fails to conduct an inquiry." *State v. Pfannenstiel*, 302 Kan. 747, Syl. ¶ 5, 357 P.3d 877 (2015). "An appropriate inquiry requires fully investigating (1) the basis for the defendant's dissatisfaction with counsel and (2) the facts necessary for determining if that dissatisfaction warrants appointing new counsel, that is, if the dissatisfaction is 'justifiable.'" 302 Kan. at 761.

Relevant here, the court's inquiry does not require "a detailed examination of every nuance of a defendant's claim of inadequacy of defense and conflict of interest." *State v. Staten*, 304 Kan. 957, 972, 377 P.3d 427 (2016). Rather, the Kansas Supreme Court has found that "'[a] single, open-ended question by the trial court may suffice if it provides the defendant with the opportunity to explain a conflict of interest, an irreconcilable disagreement, or an inability to communicate with counsel.'" *State v. Toothman*, 310 Kan. 542, 554, 448 P.3d 1039 (2019).

We find the district court made a sufficient inquiry into the basis for Waterman's dissatisfaction with Campbell. The record reflects that the district court had read the motions filed by Waterman and Campbell, and the court was aware of the stated concerns. The district court held a hearing, and Waterman and Campbell were allowed to elaborate on their problems. The district court also was aware of Waterman's purported civil claim against Campbell and the alleged ethical complaint. The district court made findings on all these matters in denying the motions for substitute counsel.

Waterman also argues that the district court abused its discretion in finding he did not establish a justifiable dissatisfaction supporting the appointment of new counsel because he established both a breakdown of communication and a conflict of interest.

33

The Kansas Supreme Court has noted that disagreements or a lack of communication between a defendant and counsel will not always rise to the level of justifiable dissatisfaction. *State v. Brown*, 305 Kan. 413, 425, 382 P.3d 852 (2016). "'"[A]s long as the trial court has a reasonable basis for believing the attorney-client relation has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel."' [Citation omitted.]" *State v. Bryant*, 285 Kan. 970, 986-87, 179 P.3d 1122 (2008).

Waterman and Campbell both alleged a breakdown in communication. Although Campbell asserted that his relationship with Waterman was contentious and stated he was unsure if he could continue effectively representing Waterman, he explained that over the two years of his representation they had been able to correspond and meet about the case and various motions. Campbell classified Waterman's displeasure with his representation to be "both real and perceived." He clarified that Waterman simply did not want to communicate and did not trust him because he believed Campbell worked for the court and the State's interests. Despite Campbell's own request to withdraw, the district court focused on the fact that Campbell had continued to provide effective representation, which had not been adversely affected by the communication issues.

After going over the difficulties of Waterman and Campbell's relationship, the district court explained that Waterman's inability to get along with Campbell was not sufficient to constitute justifiable satisfaction. It noted that Waterman had displayed a pattern of such behavior with all his other appointed attorneys. The district court found that it was unlikely that Waterman could get along with a different attorney even if it could find substitute counsel and permitted Campbell to withdraw. The Kansas Supreme Court has noted that "when the defendant's dissatisfaction emanates from a complaint that cannot be remedied or resolved by the appointment of new counsel—such that replacement counsel would encounter the same conflict or dilemma—the defendant has not shown the requisite justifiable dissatisfaction." *Breitenbach*, 313 Kan. at 90-91.

34

Waterman's claim of a communication breakdown was a recurring problem with all the attorneys appointed to represent him—the record suggests that Waterman would likely have developed the same communication problems with any attorney representing him. The district court did not abuse its discretion in finding that Waterman's complaints did not rise to the level of a complete breakdown of communication.

Waterman also alleges that he established he and Campbell had a conflict that necessitated the appointment of substitute counsel. His argument mainly relies on the fact that he sued Campbell and filed a disciplinary complaint against him.

A conflict of interests exists when an attorney is put in a position where divided loyalty is likely, "and can include situations in which the caliber of an attorney's services 'may be substantially diluted.'" *Pfannenstiel*, 302 Kan. at 758. Ultimately, "[c]onflict of interest and divided loyalty situations can take many forms, and whether an actual conflict exists must be evaluated on the specific facts of each case." 302 Kan. at 758.

In his initial motion, Waterman asserted a far broader claim of conflict of interest than against merely Campbell. He argued that essentially everyone involved in the case was conflicted because he had "civil suits pending against the entire county." His main complaint against Campbell was that he "has refused an[d] will not provide or secure relevant evidence or information in my best interest." He later stated that he sued Campbell and filed a disciplinary complaint against him and threatened to do so again when the district court stated it was inclined to deny his motion for substitute counsel.

Even though Waterman may have initiated litigation and filed complaints against Campbell, this court has previously held that a defendant's pending disciplinary case against their counsel does not automatically create an irrevocable conflict of interest, depending on the nature of the complaint. *State v. Robertson*, 30 Kan. App. 2d 639, 644-49, 44 P.3d 1283 (2002). Waterman is correct that the district court did not ask him to

35

expound on the grounds for his lawsuit or disciplinary complaint against Campbell. Still, the district court observed that Campbell was highly qualified and had been representing Waterman "in a manner and custom consistent with the highest degree of professional norms." Waterman presented no allegations showing that these actions taken against Campbell affected the quality of Campbell's representation or that the friction between them resulted in any divided loyalty on Campbell's part.

In sum, Waterman was a difficult defendant who went through seven court-appointed attorneys and complained that most had conspired with the prosecutor to secure his convictions. An asserted breakdown in communication will not rise to the level of justifiable dissatisfaction if the district court's observation is that counsel can still provide effective representation of the defendant. On this point, we must give substantial deference to the district court. Here, the district court properly observed that Waterman's refusal to cooperate with Campbell was a problem of his own making and that any new counsel would have the same problems with Waterman as Campbell was having. Even a defendant filing an ethical complaint or a civil lawsuit against counsel will not automatically create an irrevocable conflict of interest because otherwise any criminal defendant could always disqualify their lawyer by filing such proceedings. Considering all the circumstances of Waterman's case, we conclude the district court did not abuse its discretion by denying the motions for substitute counsel.

### DID THE DISTRICT COURT ABUSE ITS DISCRETION BY FAILING TO ASK JURORS ABOUT THEIR POTENTIAL BIASES?

In his pro se supplemental brief, Waterman argues the district court abused its discretion by not asking jurors about their relationships to law enforcement, which he contends deprived him of a fair trial. Waterman raised these concerns at trial when he filed a pro se "Motion for a Mistrial due to Premeditated prejudice to violate Voir dire."

Waterman asked the district court to grant him a new trial or set a new jury although he offered no details evincing any juror bias beyond alleged friendship with police officers.

Waterman does not cite any portions of the record to support his claim that any jurors were allegedly biased against him. Nor does he explain why any such jurors could not have simply been removed for cause under K.S.A. 22-3410 or with a peremptory challenge under K.S.A. 2022 Supp. 22-3412. Because Waterman has not provided record citations to bolster his claim or legal support for his argument that it was the district court's job to address the matter sua sponte, we treat this issue as waived or abandoned. See *State v. Liles*, 313 Kan. 772, 783-84, 490 P.3d 1206 (2021).

### DID THE STATE INTRODUCE PERJURED TESTIMONY?

Also, in his pro se supplemental brief, Waterman argues this court should order a new trial because the State knowingly used perjured testimony from Dwayne to secure his convictions. Waterman cites no authority to support his argument and cites no portion of the record to support his conclusory allegations. Waterman's argument is best characterized as an attempt to impeach the credibility of Dwayne's testimony by pointing out inconsistencies between his testimony at the preliminary hearing and at trial, which he contends was encouraged by the State.

To show that his due process rights were violated by the State's introduction of perjured testimony, Waterman would need to show "(1) the prosecution knowingly solicited the perjured testimony, or (2) the prosecution failed to correct testimony it knew was perjured." *State v. Betts*, 272 Kan. 369, Syl. ¶ 5, 33 P.3d 575 (2001), *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006). Waterman addresses neither point beyond simply stating that Dwayne was making false statements and the State knew of the falsity. He has not sufficiently briefed this issue, and an issue not briefed is waived or abandoned. *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021).

37

DID THE DISTRICT COURT ABUSE ITS DISCRETION IN DENYING WATERMAN'S MOTION FOR MISTRIAL BASED ON INEFFECTIVE ASSISTANCE OF COUNSEL?

In his supplemental brief, Waterman asserts that he received ineffective assistance of counsel from his trial counsel, Campbell. The State argues that this court should not reach this issue because it is being raised for the first time on appeal, but its argument is misplaced. Waterman filed a posttrial, pro se motion for a mistrial in which he alleged that his counsel was ineffective. The district court addressed the motion and denied it at a posttrial hearing on December 28, 2021. Thus, the issue is preserved for appeal.

To briefly review the pertinent facts, six days after the trial, Waterman filed a pro se "Motion for Mistrial for Ineffective Assistance of Counsel." In his motion, Waterman argued that a "mistrial" was required for his attorney's deficient performance. He argued that Campbell should have presented more evidence on the varying sizes of the knife wounds (which he alleged suggested that Dwayne had stabbed Bob after he did) and that Campbell did not sufficiently impeach the credibility of Bob and Dwayne's testimony. Campbell also moved for a new trial on Waterman's behalf based on violation of court orders relating to the treatment of Waterman during the trial and for improper contact between the jurors and law enforcement. But because Waterman filed a formal disciplinary complaint against Campbell and also named Campbell as a party in a federal lawsuit, Campbell moved to withdraw from the case due to a conflict.

At the hearing on the posttrial motions, the district court first addressed Campbell's motion to withdraw. Campbell explained to the court that he believed he needed to request to withdraw because of the disciplinary complaint. In response to the court's questioning, Campbell stated that he would do his best to continue to zealously advocate for Waterman. But Campbell also added, "I dispute the allegations that he filed in his motion for ineffective assistance. I dispute what he alleged in the disciplinary complaint." The district court denied Campbell's motion to withdraw.

Next, the district court addressed Waterman's pro se motion for a mistrial. Without asking Campbell whether he could argue the motion on Waterman's behalf, the district court simply asked Waterman to address the motion. Waterman argued the motion himself, reasserting his claim that he should receive a "mistrial" because of Cambell's ineffective representation at trial. Waterman focused his argument on Campbell's failure to highlight the different sizes of the knife wounds Bob suffered. The district court denied Waterman's motion, finding that Waterman had received "very effective assistance of counsel" at his trial. Finally, the district court addressed Campbell's motion for new trial and after hearing arguments from counsel, the district court denied that motion, as well.

On appeal, Waterman's pro se supplemental brief argues only that the district court abused its discretion in denying his motion for mistrial based on ineffective assistance of counsel. But the brief filed by Waterman's counsel claims the district court committed structural error by denying the appointment of conflict-free counsel to argue Waterman's posttrial motion and requiring Waterman to argue the motion himself. Waterman argues that at the posttrial hearings, "Campbell was forced to choose to defend himself or his client. In the end, Campbell stood silent. [Waterman] was left to argue his motion for ineffective assistance of counsel without the aid of counsel." He asserts "[t]he failure to appoint new counsel was structural error and cannot be passed over as harmless error."

The State responds that "new counsel should not be required every time a defendant mentions the words ineffective assistance of counsel." The State asserts that the allegations in Waterman's pro se motion were conclusory and not supported by the evidence. As a result, Campbell's performance was not deficient. The State also argues that "no prejudice occurred because . . . Waterman's confession on the stand and the incriminating texts and letter unquestionably establish his guilt of attempted murder."

It is the task of the district court to ensure that a defendant's right to counsel under the Sixth Amendment to the United States Constitution is honored. *State v. Sharkey*, 299

39

Kan. 87, 96, 322 P.3d 325 (2014). In order to fulfill this duty, when the district court becomes aware of a possible conflict of interest between an attorney and a defendant charged with a felony, the court has a duty to inquire further. 299 Kan. at 96. If an appropriate inquiry is made, the district court's decision is reviewed under an abuse of discretion standard. 299 Kan. at 96-97. But a district court abuses its discretion when it makes no inquiry into the nature of the conflict. 299 Kan. at 97.

We begin by finding that Waterman's pro se motion for "mistrial" clearly should be construed as a motion for new trial alleging ineffective assistance of counsel. "'[P]ro se pleadings are to be liberally construed to give effect to their content rather than adhering to any labels and forms used to articulate the pro se litigant's arguments.' [Citation omitted.]." *State v. Gilbert*, 299 Kan. 797, 798, 326 P.3d 1060 (2014). And Waterman filed his motion six days after the trial, so it was timely. See K.S.A. 22-2301(1) (providing that a motion for new trial generally must be filed within 14 days after the verdict or finding of guilt). Thus, the issue in this appeal is whether the district court committed structural error by denying the appointment of conflict-free counsel to argue Waterman's motion for new trial alleging ineffective assistance of counsel.

The Kansas Supreme Court addressed this issue in *Sharkey*, 299 Kan. at 91-101. Sharkey was found guilty by a jury of aggravated indecent liberties with a child. Seven days after the trial, he filed a pro se motion for new trial based on ineffective assistance of counsel and also a motion for new counsel. Sharkey's counsel also filed a motion for new trial. At the hearing, the district court made no inquiry into the nature of the conflict between Sharkey and his counsel and simply asked Sharkey to argue his own motion, which the district court denied. Sharkey's counsel also argued his motion for new trial which the district court denied. On appeal, Sharkey argued the district court should have appointed conflict-free counsel to assist him in arguing his pro se motion for new trial.

40

Our Supreme Court began its analysis by finding that a timely motion for new trial is a critical stage of the criminal proceedings, and because Sharkey's motion was timely, he had a right under the Sixth Amendment to be represented by conflict-free counsel at the hearing on his pro se motion for new trial. 299 Kan. at 96. Next, the court observed that the potential of a conflict of interests between Sharkey and his counsel was apparent because Sharkey was alleging ineffective assistance of counsel. Faced with this conflict, the trial judge was required to make an appropriate inquiry into the conflict, and the failure to do so was an abuse of discretion. 299 Kan. at 98.

Our Supreme Court then addressed the effect of the district court's abuse of discretion and, specifically, whether Sharkey must show he was prejudiced by having to represent himself on his pro se motion for new trial. In this analysis, the court observed that there are three categories of ineffective assistance of counsel claims brought under the Sixth Amendment according to *Mickens v. Taylor*, 535 U.S. 162, 166, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002). 299 Kan. at 100.

> "The first category includes cases in which it is claimed that counsel's performance was so deficient that the defendant was denied a fair trial. These claims are controlled by *Strickland* [*v. Washington*, 466 U.S. 668, 687, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. . . . The second category applies when the assistance of counsel was denied entirely or denied at a critical stage of the proceedings. *United States v. Cronic,* 466 U.S. 648, 658-59, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), defines the standard that applies to these claims. The third category includes situations where the defendant's counsel 'actively represented conflicting interests.' *Mickens*, 535 U.S. at 166." 299 Kan. at 100.

Our Supreme Court found that Sharkey's situation where he was denied conflict-free counsel to argue his motion for new trial alleging ineffective assistance of counsel fell under the second *Mickens* category—the *Cronic* exception—where the denial of the assistance of counsel at a critical stage of the proceedings presented circumstances of such magnitude that prejudice to the defendant is presumed. 299 Kan. at 100-01. The

41

court found that "[u]nder *Cronic*, Sharkey was constructively denied his right to counsel because of his attorney's conflict of interests; he effectively had no legal representation at the motions hearing. . . . This leads to a presumption of prejudice." 299 Kan. at 101. As a result, our Supreme Court remanded the case to district court with instructions to hold a new hearing on Sharkey's pro se motion for new trial with conflict-free counsel appointed to argue the motion. 299 Kan. at 101. See *Fuller v. State*, 303 Kan. 478, 495-503, 363 P.3d 373 (2015) (holding the same as *Sharkey* in a case arising under K.S.A. 60-1507).

*Sharkey* controls the outcome of Waterman's case. After Waterman was found guilty at trial, he filed a timely pro se motion for new trial alleging ineffective assistance of counsel. At the hearing, the district court conducted enough of an inquiry with Campbell to learn that Waterman had filed a disciplinary complaint against Campbell. But the district court only seemed concerned with whether Campbell could argue his own motion for new trial. The district court ignored the more obvious conflict that Waterman was alleging that Campbell provided ineffective assistance at his trial. On the pro se motion, the district court simply addressed Waterman and asked him to argue his motion without the assistance of counsel. Campbell not only stood silent on this motion, but he argued against it by saying, "I dispute the allegations that [Waterman] filed in his motion for ineffective assistance." As in *Sharkey*, Waterman "was constructively denied his right to counsel because of his attorney's conflict of interests; he effectively had no legal representation at the motions hearing." 299 Kan. at 101.

The State argues that no prejudice occurred here because Waterman's claims in his motion were conclusory and because of the overwhelming evidence of Waterman's guilt. But Waterman's situation falls under the *Cronic* exception for a claim of ineffective assistance of counsel. *Sharkey*, 299 Kan. at 100-01. Because Waterman was denied conflict-free counsel at a critical stage of his criminal proceedings, he need not show prejudice to receive relief. We do not dispute the notion that this may be considered a harsh result. But it is not our court's function at this stage of the proceedings to evaluate

42

the merits of Waterman's motion, nor do we weigh the evidence against him at trial. Perhaps if the district court had found some procedural reason not to address Waterman's motion, for instance if the motion had been untimely, then Waterman might not be entitled to any relief on appeal. But here the district court required Waterman to argue his timely motion for new trial without the assistance of legal counsel. Under *Cronic* and *Sharkey*, legal precedents that this court is duty bound to follow, this procedure amounted to structural error and Waterman need not show prejudice to receive relief.

This is not to say that the district court must appoint counsel to represent a criminal defendant on all pro se motions. In fact, the district court, at its discretion, need not address every pro se motion filed in a criminal case when the defendant is represented by counsel. *State v. Pollard*, 306 Kan. 823, 843, 397 P.3d 1167 (2017). In Kansas, a party has the right to represent themselves or to be represented by counsel, but they have no right to hybrid representation. *State v. Holmes*, 278 Kan. 603, 620, 102 P.3d 406 (2004). It is only when a defendant's pro se motion alleges a possible conflict of interest between the defendant and counsel does the district court have a duty to inquire into the nature of the conflict to determine if substitute counsel is needed. *Sharkey*, 299 Kan. at 96.

Waterman's pro se motion alleging ineffective assistance of counsel raised a conflict of interest between Waterman and Campbell, and the district court erred by requiring Waterman to argue the motion without further inquiry into the nature of the conflict. As in *Sharkey*, we must remand this case to district court to hold a new hearing on Waterman's pro se motion for new trial alleging ineffective assistance of counsel, with new conflict-free counsel appointed to argue the motion. To be clear, to receive relief at this hearing, Waterman *will* be required to show that he was prejudiced by the alleged ineffective assistance of counsel, as that claim will be controlled by *Strickland*, 466 U.S. at 687. If on remand the district court denies the motion, finding no ineffective assistance of counsel, a new trial is unnecessary. But if the district court grants the motion, finding ineffective assistance of counsel, a new trial must be held and trial counsel appointed.

43

DID CUMULATIVE ERROR DEPRIVE WATERMAN OF HIS RIGHT TO A FAIR TRIAL?

Waterman argues cumulative error denied him a fair trial. Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. *Alfaro-Valleda*, 314 Kan. at 551-52.

We have identified only two possible trial errors. First, we found that any error in failing to instruct the jury on the lesser offense of criminal restraint was harmless. Second, we found the district court committed structural error by requiring Waterman to argue his pro se motion for new trial without the assistance of conflict-free legal counsel, and we have granted relief for this error. Even when these errors are viewed collectively, we find that Waterman is entitled to no relief under the cumulative error rule.

DID WATERMAN RECEIVE AN ILLEGAL SENTENCE?

Waterman argues that his sentence is illegal because the district court improperly included three prior misdemeanors (which it aggregated into a felony) when calculating his criminal history score. The State concedes that Waterman's sentence is illegal.

The court may correct an illegal sentence at any time while the defendant is still serving the sentence. K.S.A. 2022 Supp. 22-3504. An illegal sentence claim may be raised for the first time on appeal. *State v. Dickey*, 301 Kan. 1018, 1031, 350 P.3d 1054 (2015). Whether a sentence is illegal under K.S.A. 22-3504 is a question of law subject to unlimited review. *State v. Mitchell*, 315 Kan. 156, 158, 505 P.3d 739 (2022).

Waterman raises separate challenges to the inclusion of misdemeanor convictions from Missouri and Oklahoma that were used to calculate his criminal history score. As for the Missouri conviction, Waterman argues the conviction was uncounseled and

obtained in violation of his Sixth Amendment right to counsel and, therefore, could not be used in calculating his criminal history score. The Kansas Supreme Court has noted that "[a]n uncounseled misdemeanor conviction obtained in violation of the misdemeanant's Sixth Amendment right to counsel may not be collaterally used for sentence enhancement in a subsequent criminal proceeding." *State v. Youngblood*, 288 Kan. 659, Syl. ¶ 3, 206 P.3d 518 (2009). Here, the State agrees that based on the current record, Waterman's Missouri misdemeanor conviction was uncounseled. Thus, the district court erred by including this conviction in Waterman's criminal history score.

Waterman next argues that his accelerated deferred judgment for domestic assault and battery from Oklahoma should not have been included in his criminal history score. He relies on *State v. Hankins*, 304 Kan. 226, 233-39, 372 P.3d 1124 (2016), in support of his argument that the Oklahoma offense is a deferred judgment and cannot be included in his criminal history score. Waterman's reliance on *Hankins* is misplaced, as it fails to address the difference between a deferred judgment and an accelerated deferred judgment under Oklahoma law. In *Hankins*, the defendant received a deferred judgment, which, as the Kansas Supreme Court explained, operates similarly to diversion and defers not only a defendant's sentence but also judgment. A deferred judgment, similar to a diversion agreement, cannot be included in a defendant's criminal history score. 304 Kan. at 238-39.

Waterman's conviction was not a deferred judgment, it was an accelerated deferred judgment under Okla. Stat. Ann. § 991c(G), which operates as a judgment of guilt. The statute provides:  "Upon any violation of the deferred judgment, other than a technical violation, the court may enter a judgment of guilt . . . ." Okla. Stat. Ann. § 991c(G). Thus, it appears that Waterman violated the conditions of his deferred judgment and received an accelerated deferred judgment—that is, a conviction/judgment of guilt. As a result, the Oklahoma conviction was properly included in his criminal history score.

Because the district court improperly included Waterman's uncounseled Missouri misdemeanor conviction, his sentence is illegal. Thus, we vacate Waterman's sentence and remand for resentencing using a correct criminal history score.

CONCLUSION AND REMAND ORDER

Waterman's sentence is vacated. We remand this case to district court for resentencing and to hold a new hearing on Waterman's pro se motion for new trial alleging ineffective assistance of counsel, with new conflict-free counsel appointed to argue the motion. If on remand the district court denies the motion, finding no ineffective assistance of counsel, a new trial is unnecessary and the district court can resentence Waterman using a correct criminal history score. But if the district court grants the motion for new trial, finding ineffective assistance of counsel, a new trial must be held and trial counsel appointed.

Affirmed in part, reversed in part, sentence vacated, and case remanded with directions.