NOT DESIGNATED FOR PUBLICATION

No. 125,384

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

KYLE C. SCOTT,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; DAVID B. DEBENHAM, judge. Submitted without oral argument. Opinion filed August 22, 2025. Affirmed.

*Darby VanHoutan*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, deputy district attorney, *Michael F. Kagay*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before ISHERWOOD, P.J., WARNER and HURST, JJ.

PER CURIAM: Kyle C. Scott stands convicted of rape and aggravated indecent liberties with a child. He brings this appeal to challenge alleged deficiencies in his trial counsel's representation, the manner in which the State presented particular pieces of evidence, and arguments advanced by the State which purportedly deprived him of a fair trial. Finally, Scott contends the district court erred when imposing his sentence. For the reasons set forth in our analyses below, Scott's convictions and sentence are affirmed.

1

FACTUAL AND PROCEDURAL BACKGROUND

In 2019, Scott and his then-wife, Celia Jenks, operated a daycare in their home and provided care for three-year-old A.S. The couple had provided care for A.S. from the time she was four months old. In August 2019, Jenks started a job with a nearby daycare center and was assigned to attend training on the 20th and 21st of that month. A.S.'s mother agreed to allow Scott to care for A.S. while Jenks was away because she never had any concerns with A.S.'s safety while she was with Scott.

On the afternoon of August 21st, A.S.'s great aunt picked A.S. up from daycare and as they drove away, she inquired what kind of day A.S. had. A.S. responded that Scott touched her with his hands and penis. When they met A.S.'s mother for dinner, A.S.'s great aunt encouraged the mother to ask A.S. about her day. When she did so, A.S. again stated that Scott touched her with his hands and penis. A.S.'s mother inquired whether Scott's pants were on or off and A.S. reported that they were off.

A.S.'s mother called the police and was instructed to take A.S. to the hospital. Detective Alexander Melius met A.S. and her mother there, and the mother informed him that A.S. said Scott touched her with his hands and penis while his pants were off.

The next day, A.S. participated in a forensic interview at LifeHouse Child Advocacy Center and reported that "'Kyle [Scott] tickled me with his hands and his penis'" while Jenks was gone at work. She disclosed that Scott took her underwear off and touched the inside of her vagina with his hand, which felt "ticklish," and used an anatomical drawing to show where Scott touched her. A.S. told the interviewer that Scott also took off his shirt, pants, and underwear and that she could see his penis. She described Scott shaking his penis and that "milk" from it went into his hand and onto the living room floor.

2

A.S. underwent an examination the same day and told the sexual assault nurse examiner, Joy Thomas, that Scott touched her with his penis on her inside and outside. Thomas noted a bluish discoloration in A.S.'s right groin area and observed redness in her vaginal region. Thomas collected swabs from A.S. but the presence of seminal fluid or Scott's DNA ultimately was not detected either on the swabs or from samples collected from Scott's living room carpet.

Law enforcement officers brought Scott in for an interview, and he told Detective Melius that he knew why he was there but was reluctant to talk for fear of the consequences. Scott explained that he suffered from "really bad lapses in judgment" coupled with considerable "mental health issues," but was not a monster or the criminal the detective might imagine him to be. He told Melius that he wanted things to go as smoothly as possible and did not want to go to jail but acknowledged that opening up to the detective meant incriminating himself. Detective Melius explained that he wanted to understand what went through Scott's mind when he was alone with A.S. Scott responded there "was no reason, it just happened," and he did not want to "go into details because I don't want to have to admit it. I mean, at least not to you."

Scott was placed under arrest and ultimately charged with rape, in violation of K.S.A. 21-5503(a)(3), lewd and lascivious behavior, in violation of K.S.A. 21-5513(a)(2), and two counts of aggravated indecent liberties with a child, in violation of K.S.A. 21-5506(b)(3)(A).

Scott called Jenks from jail and told her, "I can't believe I fucked up again." Jenks was aware of the pending charges at that point and when she remarked that she did not "believe it," Scott replied, "Well babe, I'm sorry but you kinda have to" and attempted to explain his actions as simply "stupid," "a lapse in judgment," "a mistake," and "impulsive." He assured Jenks he was "not this person," which prompted her to verify,

3

"But you did it." Scott expressed awareness of that fact and that he knew what he did was wrong but hoped he could get the help he clearly required.

A little over two weeks before trial was scheduled to begin, Jason Belveal, Scott's fourth court-appointed attorney, moved to withdraw citing a breakdown in his ability to communicate with Scott, as well as a conflict of interest between them. Belveal's motion noted that Scott sent him a letter containing allegations that Belveal threatened him and attempted to coerce him into taking a plea. The same letter indicated that Scott either filed an ethics complaint against Belveal or intended to do so.

Scott followed suit a few days later and formally moved for a new attorney. According to Scott, the appointment of substitute counsel was warranted because Belveal declined to communicate effectively with him and neglected to conduct any sort of meaningful investigation of his case.

The district court conducted an evidentiary hearing to resolve the issue and ultimately denied both motions. It acknowledged that while the evidence demonstrated some measure of disagreement between Scott and his attorney, as well as Scott's clear preference to be the one that "call[ed] the shots," it did not establish the existence of justifiable dissatisfaction as required to warrant the appointment of substitute counsel.

The case proceeded to trial, and A.S. testified about the details of the incident at Scott's house. She also explained that she told her great aunt and the LifeHouse forensic examiner about the touching. The State introduced the video of A.S.'s forensic interview, the sexual assault nurse examiner's report, and medical records as a means of corroborating A.S.'s statements.

A.S.'s mother testified and informed the jury that ever since the incident with Scott, A.S.'s visits to her pediatrician were plagued with "hyperventilating and crying," as

4

well as the refusal to allow anyone to touch her. The onset of A.S.'s unusual and distressed behavior was corroborated by testimony from her pediatrician.

The State also called Christopher Sanford, a fellow inmate of Scott's, as a witness. According to Sanford, Scott disclosed that he was in jail for touching an adolescent "beneath her panty line," and he was concerned that DNA from his saliva would be found on the girl's body.

The State also played a portion of Scott's recorded interview with detectives which enabled the jury to hear Scott's acknowledgment of why he was brought in for questioning and his reluctance to speak with officers without an attorney present for fear of getting into trouble. The jury likewise listened to a recording of the call between Scott and Jenks and heard Scott's statement that he "fucked up again," and his response, "Well babe, I'm sorry but you kinda have to" when she expressed disbelief about the charges. That recording also enabled the jury to hear Scott's inculpatory statements which described his actions as "stupid," "a lapse in judgment," "a mistake," "impulsive," and "wrong."

The jury convicted Scott of rape and two counts of aggravated indecent liberties with a child. The district court later merged the last two counts as they were multiplicitous.

Not long after the verdict was entered, Scott filed a motion requesting a new trial, due in part to Belveal's allegedly deficient representation. Scott reiterated his earlier claim that Belveal failed to communicate with him effectively, neglected to thoroughly investigate the case and prepare for trial, and did not consult or call an expert to scrutinize A.S.'s forensic interview. Counsel appointed to replace Belveal filed a separate motion for a new trial to assert that the district court erred when it denied Belveal's pretrial request to withdraw from the case and that Belveal was ineffective during his

time as Scott's attorney. Counsel also adopted the claims outlined in the motion for a new trial that Belveal filed prior to his removal from the case. Specifically, that evidence of Scott's past sex addiction treatment was improperly admitted at trial and the State committed prosecutorial error during closing arguments.

The district court conducted an extensive evidentiary hearing to resolve Scott's ineffective assistance of counsel claim. Scott called Jennifer Johnson, a doctor of nursing practice, to testify as an expert with respect to the sexual assault exam Thomas performed on A.S. Johnson opined that Thomas' exam fell short of expected standards. Belveal acknowledged Scott's assertion that he did not meet with Johnson during his trial preparations. He explained that he was already familiar with Johnson and did not believe her services were warranted given that he had encountered Thomas as a witness a considerable number of times throughout his extensive career in the jurisdiction and was well-acquainted with her manner of testimony.

Belveal admitted that he neither enlisted an expert to analyze A.S.'s forensic interview nor utilized a private investigator during trial preparations but explained that in his professional opinion, neither was necessary. First, he observed nothing problematic in the interview which necessitated the involvement of an expert and he ultimately did not have any tasks to assign the investigator he hired. Belveal also acknowledged that he did not object to either Jenks' testimony regarding Scott's sex addiction treatment or to particular statements made by the prosecution in closing argument. Belveal explained that his silence in those moments was a strategic choice taken to avoid shining a spotlight on those issues for the jury. Belveal agreed with Scott's assertion that they did not meet to substantively review the evidence and finalize strategy until the week before trial. However, Belveal explained that his overall preparation commenced long before that time and included several phone discussions with Scott.

6

At the conclusion of the proceeding, the district court advised the parties to submit their closing arguments in writing and scheduled a date for which it would orally pronounce its ruling on the matter.

Prior to sentencing, Scott moved for a downward durational departure hoping to persuade the district court that his case presented substantial and compelling reasons to impose a grid-based sentence, rather than the considerably more severe, statutorily mandated punishment of life in prison without consideration for parole until he served 25 years. Scott specifically claimed that his crimes of conviction reflected a deviation in his otherwise normal life, that he posed a minimal risk of reoffending, he was amenable to treatment, and that research demonstrated incarceration alone does not reduce the likelihood of an offender committing sex crimes in the future.

At sentencing, the district court first took up Scott's ineffective assistance of counsel claims and his request for a new trial. It determined that he failed to demonstrate that Belveal's representation fell below the objective standard of reasonableness and he likewise did not carry his burden to establish that the State committed reversible prosecutorial error. The district court moved on to the imposition of sentence and declined to find any substantial and compelling reasons existed to grant Scott's request for a departure to the grid. Scott was sentenced to serve two concurrent life sentences without the possibility of parole for 25 years.

Scott timely appeals.

Additional facts will be set out below as necessary to our analyses of the issues raised on appeal.

7

LEGAL ANALYSIS

*Did the district court err in denying the pretrial motions for substitute counsel?*

In his first claim of error, Scott contends that where his request for substitute counsel and Belveal's motion to withdraw similarly evidenced the existence of his irreconcilable conflict with Belveal, as well as a broken channel of communication between them, the district court abused its discretion when it declined to appoint substitute counsel. Scott argues this error necessitates reversal of his convictions and an order for a new trial. The State counters that the district court properly declined to find that the circumstances warranted the replacement of Scott's fourth appointed attorney.

The United States and Kansas Constitutions guarantee criminal defendants a right to the effective assistance of counsel. Yet they do not contain a corresponding right which entitles an offender to the appointment of counsel of their own choosing. *State v. Breitenbach*, 313 Kan. 73, 90-91, 483 P.3d 448 (2021).

When a criminal defendant expresses dissatisfaction with his or her court-appointed attorney, the district court has a duty to inquire further into the claims and may appoint substitute counsel when the facts and circumstances demonstrate such action is necessary. To warrant substitute counsel, a defendant has the burden to show justifiable dissatisfaction with their current attorney. That burden can be satisfied with evidence that demonstrates "'a conflict of interest, an irreconcilable conflict, or a complete breakdown in communications between counsel and the defendant.'" 313 Kan. at 90 (quoting *State v. Sappington*, 285 Kan. 158, 166, 169 P.3d 1096 [2007]). If the district court has "'a reasonable basis for believing the attorney-client relation has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel.'" *Sappington*, 285 Kan. at 166 (quoting *State v. Ferguson*, 254 Kan. 62, 70, 864 P.2d 693 [1993]). In those

8

instances when "the defendant's dissatisfaction emanates from a complaint that cannot be remedied or resolved by the appointment of new counsel—such that replacement counsel would encounter the same conflict or dilemma—the defendant has not shown the requisite justifiable dissatisfaction." *Breitenbach*, 313 Kan. at 90-91.

If the district court declines to appoint new counsel, the decision is reviewed for an abuse of discretion. 313 Kan. at 90. A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Bilbrey*, 317 Kan. 57, 63, 523 P.3d 1078 (2023). Scott contends the district court's refusal to appoint substitute counsel was factually flawed and unreasonable. As the party asserting the district court abused its discretion, Scott bears the burden of showing such an abuse occurred. *State v. Keys*, 315 Kan. 690, 708, 510 P.3d 706 (2022).

In this case, Scott's motion expressed discontent with the fact that Belveal allegedly pressured him to consider pursuing a plea agreement, failed to visit him at the jail, neglected to hire any expert witnesses or a private investigator, never obtained contact information for the specific defense witnesses Scott wanted to have testify, and never subpoenaed any medical records or records from the Kansas Department for Children and Families. He asserted that these factors eroded his trust and confidence in Belveal's representation and culminated in justifiable dissatisfaction which prompted him to file an ethical complaint against Belveal.

Scott testified at the motion hearing and explained that he felt compelled to file the motion, in part, because Belveal never followed through on his assurance that he would secure all audio and video discovery as requested by Scott. According to Scott, the attorney-client relationship further deteriorated when Belveal failed to hire a private investigator, refused to honor Scott's request to seek a continuance of the trial date, and neglected to secure any contact information for the witnesses Scott wanted to call at trial.

9

Notably, Scott argued in closing that his complaints concerning Belveal's representation were the same as those he had about nearly all his prior attorneys—that he was neither trustworthy nor diligent because he did not take the time to investigate the case or secure expert witnesses.

Belveal described his conflict with Scott as "irreconcilable." He testified that it escalated to that level as a product of Scott's communications with Belveal's other clients at the jail, which Belveal viewed as a calculated effort to undermine Belveal's relationships with those individuals. Additionally, to the extent Scott followed through in filing a disciplinary complaint against him, Belveal could conceive of no greater source of discord in an attorney's relationship with their client.

The district court also afforded the State a chance to be heard on the issue, and it used that opportunity to introduce recordings from phone calls Scott placed from the jail to his mother and grandmother. Collectively, those calls revealed Scott's persistent complaints that Belveal declined to litigate the case as Scott directed and, like his prior attorneys, Belveal encouraged Scott to consider pursuing a plea offer because he would likely be convicted of at least one count if they went to trial. During those calls, Scott was also disgruntled with Belveal's failure to provide all discovery and request a continuance because there was not sufficient time remaining to be prepared for trial. The State argued it was clear from the calls that Scott's actual issue with Belveal's representation was that he recommended plea negotiations and did not allow Scott to dictate every aspect of the case.

At the conclusion of the proceeding, the district court noted they were not wading in foreign waters. Rather, throughout the tenure of the case, Scott engaged in a cycle of filing motions to remove and replace his attorneys, seemingly as a means to delay the commencement of his trial for as long as possible.

A fair review of Scott's case reveals a history of alleged dissension between Scott and each of his court-appointed attorneys during the roughly three-year life span of his case. Scott's original attorney was dismissed after Scott alleged the existence of a breakdown in their ability to communicate effectively with one another. The district court then allowed Scott's second counsel to withdraw after an ethics complaint filed by Scott's mother led counsel to conclude that any further attorney-client relationship was an impossibility. Finally, Scott's third appointed attorney was dismissed in the wake of Scott's decision to represent himself.

On appeal, Scott argues that he successfully established deficiencies in Belveal's communication tactics, as well as his trial preparation, and that a conflict of interest certainly existed given the ethics complaint Scott filed against him. The State counters that the district court did not abuse its discretion in finding that the justifiable dissatisfaction required to appoint substitute counsel was not established. It contends that Belveal's manner of communication was not objectionable; Scott simply did not want to hear what Belveal told him. The State further asserts that Belveal's trial preparations were satisfactory and that a defendant cannot fashion a conflict of interest and disqualify their lawyer merely by filing an ethical complaint.

Our Supreme Court has noted that justifiable dissatisfaction constitutes a threshold and not every disagreement or flawed channel of communication between an attorney and their client will meet it. *State v. Brown*, 305 Kan. 413, 425, 382 P.3d 852 (2016). "As long as the trial court has a reasonable basis for believing the attorney-client relation has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel." *State v. Banks*, 216 Kan. 390, 394, 532 P.2d 1058 (1975).

We begin our analysis with the purported breakdown in communication and Belveal's allegedly subpar trial preparations. In declining to find these factors cleared the

11

dissatisfaction threshold, the district court observed that while there was some measure of disagreement between Scott and his attorney, Scott's history reflected repeated attempts to commandeer those aspects of the case preparation that are his counsel's responsibility to manage. It concluded there was not a complete breakdown in communication and noted that given Belveal marked the fourth appointed attorney against whom Scott lodged this type of complaint it was unlikely that substitute counsel would enjoy a brighter fate.

Scott contends the district court's decision was factually tenuous and unreasonable given his own testimony which established that he only shared a limited number of in-person meetings with Belveal, that Belveal failed to retain expert witnesses or a private investigator, and that Belveal tabled further work on Scott's case until the substitution of counsel issue was resolved. Any thrust that Scott's claims may have carried is undermined by their conclusory nature. That is, Scott does not favor us with an explanation of exactly how his allegedly truncated meeting timeline with Belveal jettisoned their ability to communicate. A similar infirmity plagues his complaint concerning the absence of expert witnesses and an investigator—Scott does not explain why the absence of these individuals gave rise to a complete breakdown in communication with Belveal. His current approach reflects the same scant angle he pursued during his hearing before the district court.

In light of these facts, it cannot be said that the district court acted unreasonably when it denied the motions for substitute counsel. Scott failed to articulate any specific facts to support the conclusory allegations contained within his motion and offered no evidence at the hearing to demonstrate what new counsel could accomplish beyond what his previous attorneys had done, or that they would not otherwise encounter the same adversity. Accordingly, his communication-based complaint did not rise to the level of justifiable dissatisfaction. See *Breitenbach*, 313 Kan. at 90-91; see also *State v. Marshall*, 303 Kan. 438, 449, 362 P.3d 587 (2015) (no appointment of substitute counsel where defendant failed to substantiate the conclusory allegations in his motion); *State v. Myers*,

62 Kan. App. 2d 149, 168, 509 P.3d 563 (2022). We are not persuaded that the district court's refusal to find a complete breakdown in communication under these circumstances constituted an abuse of discretion.

Scott asserts that the appointment of substitute counsel was also necessary because a conflict of interest developed between him and Belveal after Scott filed an ethics complaint against him. Conflict of interest and divided loyalty situations take many forms and may include situations which substantially dilute the caliber of an attorney's services. *State v. Pfannenstiel*, 302 Kan. 747, 758, 357 P.3d 877 (2015). Whether an actual conflict exists must be evaluated on the specific facts of each case. 302 Kan. at 758.

Scott's claim is again best described as conclusory. Neither the transcript of the motion hearing nor Scott's brief on appeal illuminate the basis for the complaint. Even though he may have initiated a complaint against Belveal, this court has previously held that a defendant's pending disciplinary case against counsel does not automatically create an irrevocable conflict of interest, depending on the nature of the complaint. *State v. Waterman*, 63 Kan. App. 2d 799, 830, 540 P.3d 378 (2023). "Even a defendant filing an ethical complaint or a civil lawsuit against counsel will not automatically create an irrevocable conflict of interest because otherwise any criminal defendant could always disqualify their lawyer by filing such proceedings." 63 Kan. App. 2d at 830-31. Again, as the party alleging error, Scott bears the burden of establishing that the district court abused its discretion. *State v. DeAnda*, 307 Kan. 500, 503, 411 P.3d 330 (2018). He has failed to satisfy that obligation and, as a result, we are unable to conclude that the district court's denial of the motions to appoint new counsel was either factually infirm or unreasonable as Scott alleges.

*Did the district court err in denying Scott's motion for new trial based on ineffective assistance of counsel?*

In his next claim of error, Scott contends that the district court erred in denying his motion for a new trial because several aspects of Belveal's representation fell below the objective standard of reasonableness and resulted in prejudice to Scott's case. The State counters that the district court properly exercised its discretion in denying the motion because Belveal defended the case in a reasonably sufficient manner and Scott failed to demonstrate that he suffered any prejudice as a result of Belveal's representation. Following a thorough review of Scott's motion for a new trial, as well as its corresponding hearing, and the entire trial transcript, we are unable to conclude that Scott fulfilled either prong of the ineffective assistance of counsel inquiry, a burden he is required to satisfy to obtain the relief he seeks. Accordingly, his motion for a new trial was properly denied.

The court on motion of a defendant may grant a new trial if required in the interest of justice. K.S.A. 22-3501(1). An appellate court reviews the district court's decision on a motion for a new trial for an abuse of discretion. *State v. Davidson*, 315 Kan. 725, 728, 510 P.3d 701 (2022).

Scott's underlying ineffective assistance of counsel claim, however, presents mixed questions of fact and law requiring de novo review. See *Bledsoe v. State*, 283 Kan. 81, 91, 150 P.3d 868 (2007). Once the district court enters findings of fact and conclusions of law, this court must determine "'whether the decision reached by the trial court follows as a matter of law from the facts stated as its basis, and also whether the facts so stated have substantial support in the evidence.'" *State v. Gleason*, 277 Kan. 624, 644-45, 88 P.3d 218 (2004).

The Sixth Amendment to the United States Constitution protects the right to effective assistance of counsel, which "plays a crucial role in the adversarial system." *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); see also *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985) (adopting *Strickland*). On a new trial motion, the district court analyzes claims of ineffective assistance of counsel under the two-prong test articulated in *Strickland*. Under the first prong, the defendant must show counsel's performance was deficient by demonstrating that counsel's errors were so serious that his or her performance fell below what is guaranteed to the defendant by the Sixth Amendment to the United States Constitution. *Bledsoe*, 283 Kan. at 90-91. If successful, the court moves to the second prong to determine whether the defendant can establish prejudice—that is, whether there is a reasonable probability that the jury would have reached a different verdict absent counsel's allegedly deficient performance. *Khalil-Alsalaami v. State*, 313 Kan. 472, 485-86, 486 P.3d 1216 (2021). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *State v. Evans*, 315 Kan. 211, 218, 506 P.3d 260 (2022).

Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel must be highly deferential. A fair assessment of counsel's performance requires that every effort be made to eliminate the distorting effects of hindsight, reconstruct the circumstances of the challenged conduct, and evaluate the conduct from counsel's perspective at the time. *Khalil-Alsalaami*, 313 Kan. 472, Syl. ¶ 4.

A court considering a claim of ineffective assistance of counsel must strongly presume defense counsel's conduct fell within the wide range of reasonable professional assistance; that is, the defendant must overcome the strong presumption that, under the circumstances, counsel's action "'might be considered sound trial strategy.'" *Khalil-Alsalaami*, 313 Kan. at 485-86. "'Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *State v.*

15

*Betancourt*, 301 Kan. 282, 311, 342 P.3d 916 (2015). Merely invoking the word "'strategy'" will not insulate "'the performance of a criminal defendant's lawyer from constitutional criticism.'" *Sola-Morales v. State*, 300 Kan. 875, 887, 335 P.3d 1162 (2014). The appropriate question when analyzing an attorney's decisions in this area is whether the attorney's choices were objectively reasonable. *Bledsoe*, 283 Kan. at 93-94. A court hearing a claim of ineffective assistance of counsel must consider the totality of the evidence before the judge or jury. *Khalil-Alsalaami*, 313 Kan. at 486.

While some aspects of a criminal case remain with the accused—such as what plea to enter, whether to waive a jury trial, or whether to testify, other aspects—such as what witnesses to call, whether and how to conduct cross-examination, and other strategic and tactical decisions, are left to defense counsel after consultation with his or her client. *Edgar v. State*, 294 Kan. 828, 838, 283 P.3d 152 (2012).

The ineffective assistance of counsel claim outlined in Scott's motion had as its foundation six instances that Scott believed were evidence of subpar representation. Scott has elected to only carry four of those claims forward on appeal—that Belveal failed to (1) adequately communicate with Scott; (2) reasonably investigate potential witnesses and strategies; (3) call an already-procured expert witness to rebut the sexual assault exam and forensic interview; and (4) prepare for trial. Accordingly, we will treat the two excluded allegations—Belveal's failure to file motions or subpoena records and inappropriate comments to Scott to induce him to accept a plea—as abandoned. *State v. Allen*, 314 Kan. 280, 283, 497 P.3d 566 (2021) (noting that issues inadequately briefed are considered abandoned).

The district court conducted an evidentiary hearing to resolve Scott's claims. We review any fact findings it made during that hearing for substantial competent evidence and conduct a de novo review of the legal conclusions arising from those facts. See *Khalil-Alsalaami*, 313 Kan. at 486.

16

*Communication and preparation*

Taking each of his claims in turn, Scott first contends that Belveal's communication with him was lacking. Because this factor is largely intertwined with Scott's last allegation that Belveal was not adequately prepared for trial, we have taken the liberty of analyzing the two claims together. The State counters that the record contains substantial competent evidence to establish that Belveal adequately communicated with Scott during their preparation for trial.

The first point that Scott directs our attention to in support of this factor is that Belveal did not meet with him until 10 days after he was appointed as standby counsel. The critical point that Scott seemingly overlooks here is that Belveal was not his appointed attorney during that time. Rather, the complained-of time frame fell squarely within the period in which Scott had unequivocally assured the district court that he wanted to act as his own attorney, with Belveal acting as standby. We decline to consider conduct that did not occur during counsel's representation in our analysis of whether counsel was ineffective. Even if 10 days can properly be classified as an abnormally long time for a defendant to have to wait to meet with counsel, Scott failed to offer any evidence to the district court, or this court on appeal, to demonstrate that specific number of days falls below an objective standard of reasonable representation. Rather, he simply expresses a desire to have met and heard from Belveal with greater frequency but fails to take the critical next step of establishing that increased contact was necessary to provide adequate representation.

Scott next notes that he only shared four to five 20-minute phone calls with Belveal from the time of his appointment in mid-December 2021 to their first in-person meeting on February 4, 2022. The evidence adduced at the hearing on Scott's motion included testimony from Scott and Belveal alike that they shared multiple phone calls,

met in the courthouse holding facility before hearings, and discussed the case at the jail for several hours on three different occasions in the week leading up to trial.

The record also contains testimony from Belveal that he commenced preparations in December for the late February jury trial and the amount of discovery he was required to review in Scott's case was less than what he historically encountered in other high-level felony cases, because from an evidentiary standpoint Scott's "was a pretty simple case." What the record does not contain is any corresponding evidence from Scott that demonstrates the preparation period was too narrow and did not enable him sufficient time to communicate effectively with Belveal. That was his burden alone to bear, and he failed to sustain that burden. Accordingly, we are satisfied there is substantial competent evidence to support the district court's conclusion that Belveal was more than adequately prepared to defend the case.

*Investigation of potential witnesses and strategies*

Scott next argues that Belveal's performance was deficient because he failed to call several witnesses to testify at trial. His first point of contention is Belveal's failure to call two specific character witnesses to testify on his behalf. Belveal explained that during his investigation, he spoke with both of those individuals but neither one had anything beneficial to add to the case and neither wanted to be involved or testify on Scott's behalf. Belveal added that he was also hesitant to open the door to character evidence as it would allow the State to present the jury with evidence of Scott's bad character. We note that Scott did not call either witness to testify at the motion hearing to establish the importance of any testimony they were prepared to offer at trial, nor did he attempt to proffer what they would have testified to. The district court properly concluded that Belveal's decision not to call either witness was the result of his chosen strategy and years of trial experience and Scott failed to carry his burden to show that Belveal's decision fell below the objective standard of reasonableness.

The next witness-oriented challenge Scott advances against Belveal's representation is that Belveal received funding approval from the Kansas Board of Indigent Defense Services for a private investigator and selected a specific one so, Scott's argument goes, Belveal should have commissioned that investigator to look "into potential defense witnesses more thoroughly, review[] the qualifications of the State's witnesses, and delve[] into potential defense strategies."

Scott's assertions are plainly borne of conjecture, similar to those at issue in *Banks v. State*, No. 125,100, 2023 WL 4284950 (Kan. App. 2023) (unpublished opinion). In that case, Banks sought to present evidence of derogatory statements about the murder victim that were written on a wall with a Sharpie marker. Defense counsel ultimately did not call the retained handwriting expert because of problems with her certification. Banks later filed a K.S.A. 60-1507 motion and argued that his trial counsel should have tried to rehabilitate the witness' credentials, locate another expert, or seek a continuance. 2023 WL 4284950, at *5. The *Banks* court wholly rejected the argument that counsel was ineffective for failing to sleuth out a new expert who may be able to offer testimony that could potentially support Banks' defense. In so doing, the court specifically noted: "Our court has held over and over that '[m]ere speculation that a witness' testimony could have possibly changed the outcome of the jury verdict is not sufficient to satisfy the prejudice prong of the *Strickland* test.'" 2023 WL 4284950, at *5 (quoting *Netherland v. State*, No. 124,065, 2022 WL 2904051, at *4 [Kan. App. 2022] [unpublished opinion]); see *Mullins v. State*, 30 Kan. App. 2d 711, 719, 46 P.3d 1222 (2002).

Scott's argument is plagued with the same shortcoming. He similarly speculates that Belveal's investigator could potentially have tracked down witnesses that might have proved helpful to Scott's defense, or unearthed possible deficiencies with the State's witnesses, or perhaps crafted a favorable defense theory. But Scott bears the burden of establishing his claim of ineffective assistance of counsel by a preponderance of the evidence. *Moll v. State*, 41 Kan. App. 2d 677, 683, 204 P.3d 659 (2009). Supposition and

19

conjecture fall well short of what is required to sustain that burden. Accordingly, the district court properly concluded there was no evidence presented at the hearing to demonstrate that Belveal's decision to not use the private investigator compromised his ability to adequately present Scott's defense to the jury.

The third complaint Scott expresses with respect to Belveal's management of witnesses is his failure to interview the State's witnesses so he would be prepared to challenge their testimony. Scott and the State both assert that *McHenry v. State*, 39 Kan. App. 2d 117, 177 P.3d 981 (2008), offers a measure of guidance for resolving this claim. In that case, the district court granted McHenry's K.S.A. 60-1507 motion upon finding that his trial counsel was ineffective for failing to investigate the potential that the victim and her mother fabricated prior molestation allegations, including not interviewing several of the State's witnesses, not investigating the victim's prior rape allegation in Stafford County, and not consulting an expert in dealing with a child who might have a history of sexual abuse. 39 Kan. App. 2d at 122-23.

Scott's case is readily distinguishable from *McHenry*. McHenry successfully fulfilled his burden to demonstrate what information his trial counsel would have uncovered if he had truly conducted a thorough investigation and provided McHenry with the level of assistance he was entitled to under the Sixth Amendment to the United States Constitution. Specifically, he offered concrete avenues where inconsistencies in testimony could be uncovered, as well as evidence of fabrications, including multiple other similar accusations by the alleged victim.

By contrast, Scott merely states that Belveal should have done more to investigate the State's witnesses, without establishing how his case was compromised because of counsel's purported failure to probe further. The district court concluded that Scott failed to come forward with evidence to prove Belveal either neglected to communicate with the State's witnesses or that the information otherwise available to Belveal by virtue of

20

the preliminary hearing transcript, the video interviews of witnesses, and law enforcement reports was not sufficient to provide him with the perspective held by those individuals.

Scott next alleges that Belveal's deficiency is further evidenced by his failure to call expert witnesses to undermine the manner in which A.S.'s sexual assault exam and forensic interview were conducted. He criticizes Belveal's decision not to call Johnson to testify as an expert in the field of sexual assault exams as "inexplicable" given that she was already retained by previous counsel and was readily available to testify and provide an expert report.

While Belveal opted to not utilize Johnson as an expert witness as Scott's prior counsel apparently intended to do, that does not equate with an abject failure by Belveal to attempt to cast doubt on the integrity of the sexual assault exam. Johnson's report stated: "Erythema [redness or irritation] is not a positive finding in sexual assault evidentiary examinations as there are many variables that can result in vaginal redness, including poor genital hygiene." As Belveal explained at the evidentiary hearing, upon reviewing Johnson's report, he found it to be hyper-technical and of questionable accuracy. Thus, he did not share Scott's opinion of the persuasive value it might have with the jury. Moreover, in Belveal's professional opinion, Thomas' sexual assault exam was not the greatest hurdle they faced in this case. Nevertheless, because Thomas was the sexual assault nurse examiner for over a decade in the jurisdiction where Belveal primarily practiced, he was well-acquainted with the type of testimony she typically provided and what boundaries she adhered to when discussing the evidence in cases of this nature. That knowledge and experience led Belveal to conclude there were better avenues than engaging in a battle of the experts before the jury. Specifically, it would be more beneficial to elicit testimony from Thomas on cross-examination that while it was not possible to identify the precise source of the red marks near A.S.'s genitals, it was equally likely they manifested as a result of innocent conduct, like riding a bicycle, as it

21

was from nefarious conduct. Stated another way, Belveal did not believe a technical expert was required when he could simply lead Thomas to testify that there are limits to the interpretation and weight the exam should be given. The approach that Belveal took with this issue prompted the district court to conclude that it was not unreasonable for Belveal to pass on calling Dr. Johnson as a witness and we agree with the propriety of that conclusion.

Scott asserts that Belveal committed an additional error within the realm of expert witnesses when he neglected to retain an expert witness to review A.S.'s forensic interview. Here again, Belveal reasonably concluded that the jury did not need an expert to lead them to a conclusion they could readily ascertain on their own. He did not believe an expert who could attack the credibility of A.S.'s statements was warranted because he watched the interview and did not detect any questionable conduct on the part of the facilitator. To the contrary, the video reflected that A.S. was clearly distracted throughout the interview, but the facilitator managed to consistently recapture the child's attention without suggesting answers to questions. In rejecting Scott's contention, the district court noted that the recording of A.S.'s interview failed to disclose any questionable techniques and where Scott offered no evidence at the hearing which established the contrary to be true, there was nothing to substantiate his claim that Belveal's treatment of the issue fell below the objective standard of reasonableness. Rather, where Belveal was aware that A.S. made a spontaneous disclosure on the day of the incident and had full access to the recording of her forensic interview with which to assess the integrity of the facilitator's questioning, he exercised an appropriate trial strategy in not calling an expert. Finally, the district court noted that *Mullins* was driven by its particular facts and did not create a bright-line rule to which every defense attorney litigating a child sexual abuse case was bound going forward.

Nevertheless, Scott encourages us to parallel his case with *Mullins* as we analyze whether Belveal's performance on this matter was deficient. Mullins was convicted of

aggravated criminal sodomy and aggravated indecent liberties with a child. He later filed a K.S.A. 60-1507 motion and alleged his trial counsel was ineffective for failing to procure a witness who was an expert in child sexual abuse cases. 30 Kan. App. 2d at 717-18. At the evidentiary hearing on his motion, Mullins presented uncontroverted testimony from two expert witnesses: (1) a criminal defense attorney who stated that reasonable trial counsel would have consulted with an expert in preparation for trial; and (2) an expert in the area of interviewing children who were victims of sexual abuse that stated the victim's interviews were not reliable. Despite that evidence, the district court found that the methodologies employed by defense attorneys whose clients were charged with child molestation had recently evolved but, at the time of Mullins' trial, few attorneys would have consulted an expert on child witnesses and denied Mullins' motion. 30 Kan. App. 2d at 715.

On appeal, this court found there was not substantial competent evidence to support the conclusion reached by the district court. 30 Kan. App. 2d at 717. Rather, its finding was directly contrary to the uncontroverted expert testimony Mullins presented, that defense attorneys practicing at the time of Mullins' trial understood experts in this area were crucial. 30 Kan. App. 2d at 717. The *Mullins* court ultimately found trial counsel was ineffective for failing to consult with or procure an expert in the field of child sexual abuse cases. 30 Kan. App. 2d at 717-18.

As the State argues and as Scott acknowledges, *Mullins* does not stand for the proposition there is a bright-line rule which mandates that an expert in forensic interviews be called to testify in every child sexual abuse case. Rather, the import of *Mullins* is that a district court errs when its findings are the exact opposite of the only evidence submitted during the hearing. Again, there must be substantial competent evidence to support the factual findings relied upon by the district court. *Khalil-Alsalaami*, 313 Kan. at 486. Scott prefers to focus on the way his case aligns with *Mullins* from a purely factual standpoint. Specifically, that neither case involved visual signs,

DNA evidence, or eyewitnesses that confirmed the abuse, both defendants were convicted largely on the statements of the child victim, and no expert was called to rebut the victim's or examining nurse's testimonies. *Mullins*, 30 Kan. App. 2d at 712. But those factual similarities are truly of no moment. It is the disparities that are critical. Where Mullins presented an expert who discredited the nurse examiner's trial testimony and identified significant flaws in the study the nurse relied on, Scott neglected to call an expert at his evidentiary hearing who could address the proper protocol to follow in cases involving victims of tender years and then identify errors in A.S.'s forensic interview. *Mullins* does not provide persuasive authority that casts Scott's claim in a compelling light.

Scott also attempts to derive a benefit from *State v. Huntley*, 39 Kan. App. 2d 180, 177 P.3d 1001 (2008). There, a jury convicted Huntley of multiple convictions of rape and aggravated criminal sodomy of his children. Defense counsel requested a continuance to retain an expert's examination of the children's videotaped statements, but the district court denied that request on the grounds that such expert testimony would likely be inadmissible. This court ultimately reversed and remanded Huntley's case upon finding the district court's reasoning constituted legal error because, in cases where the theory of defense is "heavily dependent on casting doubt on the reliability of child witnesses, we deem an expert in such matters to be of utmost importance and, when denied, likely prejudicial." 39 Kan. App. 2d 188-89.

But Scott incorrectly argues that the premise in *Huntley* also works in reverse. *Huntley* instructs that a district court errs when its denial of a request for a forensic interview expert lacks a legal foundation. We decline Scott's invitation to interpret that holding to also mean that defense counsel errs by not pursuing an expert in forensic interview techniques. Neither *Mullins* nor *Huntley* serve to advance Scott's position. Substantial competent evidence supports the district court's conclusion that Belveal

24

conducted a thorough investigation of the facts—in this case, the video of the interview—making his strategic choices virtually unchallengeable. See *Betancourt*, 301 Kan. at 311.

It is without question that Scott had very strong opinions about the precise tools he wanted used to litigate his case. But as our opinion demonstrates, not all criminal cases are litigated in an identical fashion, regardless of the similarity in charges, and the tools which prove beneficial in one may not be applicable in another. This is why the aspects of Belveal's representation that Scott takes issue with are largely entrusted to defense counsel to manage with their expertise. Certain decisions relating to the conduct of the case are reserved for the accused while others are entrusted solely to defense counsel. *Winter v. State*, 210 Kan. 597, 602, 502 P.2d 733 (1972). Which witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions to file, and all other strategic and tactical decisions fall within the exclusive province of the lawyer after consultation with their client. 210 Kan. at 602. Even though experienced attorneys might disagree on the best tactics or strategy, deliberate decisions based on strategy may not establish ineffective assistance of counsel. *Flynn v. State*, 281 Kan. 1154, 1165, 136 P.3d 909 (2006).

To succeed on a claim of ineffective assistance of counsel, a defendant bears the burden to establish by a preponderance of the evidence that counsel rendered deficient representation and that defendant suffered prejudice as a result of those errors. *Khalil-Alsalaami*, 313 Kan. at 485-86. In this appeal, Scott raised four specific concerns with counsel's representation, and following a critical analysis of each of those claims, we are satisfied there is substantial competent evidence to support the district court's conclusion that Belveal's communication, preparation, and decisions on witnesses fell within an objective standard of reasonable representation. Even if any one of those issues presented a gray area, which they do not, our support for the district court's decision would stand firm as Scott also did not present a compelling case that he suffered prejudice as a result of any of the complaints he had with Belveal's representation. Again, a successful

showing of prejudice required him to establish there is a reasonable probability the outcome of his case would have been different absent counsel's deficient performance. 313 Kan. at 485-86. From the totality of the evidence elicited at trial, which included recorded statements from Scott's interview with Detective Melius as well as those from the jail calls he shared with his mother and former wife, that arguably included inculpatory statements which intimated that he engaged in inappropriate conduct with A.S., we confidently conclude that counsel's representation did not adversely affect the outcome of Scott's case. The district court's denial of Scott's motion for new trial based on ineffective assistance of counsel is affirmed.

*Did the district court err by admitting evidence of Scott's past treatment for sex addiction?*

In his next claim of error, Scott contends the district court impermissibly allowed Jenks to testify about his prior treatment for sex addiction. The State counters that we cannot review the issue because it was not preserved, but to the extent we engage in an analysis we should conclude the claim is meritless. Because this court cannot review challenges to the admission of evidence when no timely and specific objection was entered at trial, Scott's claim of evidentiary error is not properly before us for review.

Before trial, the district court granted Scott's motion in limine to exclude evidence of prior crimes and civil wrongs, bad character, or bad character traits under K.S.A. 2024 Supp. 60-455 and K.S.A. 60-446 through 60-448. On direct examination, Jenks testified that Scott called her from jail on the night of his arrest and the State played a recording of that call for the jury. On cross-examination, Belveal asked Jenks about Scott's comment during that call, that he was "being impulsive again." Jenks responded that it was part of a larger conversation they previously shared about Scott's drinking, his inability to manage money responsibly, and his relationships with other women. On redirect, the State inquired whether Scott previously received treatment for any mental health related issues.

26

Jenks testified that Scott underwent treatment for sex addiction in the months immediately preceding the incident with A.S. Scott's attorney did not object.

This evidentiary issue first surfaced as a claim of error in Scott's motion for a new trial. He argued that Jenks' testimony about his sex addiction treatment was improperly admitted and prejudiced his right to a fair trial. The district court denied the motion upon finding that sex addiction does not constitute a prior conviction or civil wrong, thus it was outside the scope of the motion in limine.

On appeal, rather than pursue review of the denial of his motion for a new trial, Scott asks this court to reverse and remand his case because the testimony at issue constituted evidence of bad character traits that are inadmissible under K.S.A. 2024 Supp. 60-455 and K.S.A. 60-446 to K.S.A. 60-448. He acknowledges that sex addiction treatment is not defined by statute or by caselaw as "bad character" evidence, but contends that in the context of this case, Jenks' testimony can be reasonably interpreted as evidence falling within that category. Scott acknowledges there was no objection when the evidence came in at trial and that this court typically does not review issues which were not preserved for appeal. *State v. Green*, 315 Kan. 178, 182, 505 P.3d 377 (2022).

Supreme Court Rule 6.02(a)(5) (2025 Kan. S. Ct. R. at 36) requires an appellant to explain why an issue that was not raised below should be considered for the first time on appeal. See *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019). In *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015), the Kansas Supreme Court warned that Supreme Court Rule 6.02(a)(5) would be strictly enforced, and litigants who failed to comply risked a ruling that the issue was improperly briefed and would be deemed waived or abandoned.

K.S.A. 60-404 acts as a "legislative mandate limiting the authority of Kansas appellate courts to address evidentiary challenges . . . . permit[ting] only one outcome

27

regarding unpreserved evidentiary challenges: that the challenge will not be the basis for setting aside the verdict or reversing the judgment." *State v. Sinnard*, 318 Kan. 261, 282, 543 P.3d 525 (2024).

Scott directs us to the oft-stated principle that there are several exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal, including: (1) The newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) the district court was right for the wrong reason. *State v. Allen*, 314 Kan. at 283. He contends that the first and second of those exceptions afford us an avenue by which to consider this claim. But that principle is not applicable to evidentiary claims raised for the first time on appeal. Even in those cases where the evidentiary issue sought to be appealed raises a constitutional claim, it is properly precluded from appellate review by the failure to object at trial. See *State v. Solis*, 305 Kan. 55, 63-64, 378 P.3d 532 (2016) (refusing to hear an evidentiary claim alleged to implicate due process when the defendant failed to timely object at trial). Moreover, the Kansas Supreme Court has consistently declined to extend the caselaw exceptions argued by Scott to circumvent the legislative mandate of K.S.A. 60-404. 305 Kan. at 63 (The Kansas Supreme Court has "refused to allow the contemporaneous objection rule to be circumvented by the caselaw exception that is designed to serve the ends of justice or prevent a denial of a fundamental right."). Accordingly, Scott's claim that the district court erroneously admitted evidence concerning his treatment for sex addiction is not properly before us for review.

*Did the State impermissibly comment on witness credibility or seek to inflame the passions of the jury?*

Scott argues that the State committed prosecutorial error during closing arguments when it commented on the reliability of A.S.'s statements and used negative language

28

about Scott with the intent of inflaming the passions of the jury. The State properly notes that Scott's claim isolates the challenged comments from the context in which they were made and that when they are reunited with the prosecutor's entire argument, it is evident they were simply highlighting evidence from the trial in a way that falls within the wide latitude afforded to prosecutors in closing argument. Because the remarks at issue did not exceed the boundaries a prosecutor is permitted in discussing the evidence, we are not persuaded that error occurred.

The appellate court uses a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022).

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

The statutory harmlessness test also applies to prosecutorial error, but when analyzing both constitutional and nonconstitutional error, appellate courts only need to address the higher standard of constitutional error. *State v. Carr*, 314 Kan. 744, 764, 502 P.3d 511 (2022).

Appellate courts will review a prosecutorial error claim based on a prosecutor's comments made during voir dire, opening statement, or closing argument even without a

timely objection, but the court may figure the presence or absence of an objection into its analysis of the alleged error. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021).

*A.S.'s statements*

Scott's first claim of error arises out of that portion of the State's argument where the prosecutor highlighted the fact that the adults in A.S.'s immediate orbit did not prompt her to make the allegations against Scott. The statements we have been asked to analyze appear in italics below:

> "[W]hen we start with the evidence, you have heard how this all came to be. How it was that [A.S.] disclosed the sexual abuse. We would submit that this is important. Not just what she says, but the way in which she came to say it. Because there will be a question at the end of this trial, and that is: Can you depend upon the statements that [A.S.] made?
>
> "*And we would submit that you can. And the reason why is because the evidence shows that no one influenced her to say these things. She wasn't prompted to say these things.* What happened was she was simply asked, 'What happened at day care?' And things went from that point forward.
>
> "One of the other things that's important about the history is, is that *there is no evidence that* [*A.S.*] *would not say* [*Scott*] *did these things to her if they were not true.* That is, there is no evidence of any antagonism in the relationship between [A.S.] and her babysitters, or between [A.S.'s mother] and [Jenks], or even [A.S.'s mother] and [Scott] before these things began.
>
> "Rather, what the evidence shows is [A.S.'s mother] had a good relationship with [Jenks]. She depended upon [Jenks] to watch her children while she was at work. And her relationship with [Jenks], and specifically [A.S.'s] relationship with [Jenks'] daughter . . . continues to this day." (Emphases added.)

We are satisfied that when viewed in their proper context, the statements simply provide accurate summaries of the evidence presented at trial. The jury did not receive any evidence which tended to indicate that someone prompted A.S. to make the

allegations. But there was affirmative evidence, particularly the testimony of A.S.'s great aunt and her mother, that the adults around her specifically refrained from prompting her, leading her, or even asking questions which might inadvertently suggest a desired answer. Thus, we decline to assign error to the prosecutor's comment that A.S. did not have an ulterior motive when she disclosed that the touching occurred.

Scott contends additional comments in the State's closing argument reflect an effort by the prosecutor to bolster A.S.'s credibility. Again, the challenged remarks are reflected in italics below:

> "You have heard the entire forensic interview, and those statements, we submit, are very important because they are eyewitness accounts of what happened. That is, what [A.S.] said in that forensic interview is an eyewitness to a crime, describing to you who committed the crime, and how it happened.
>
> "So let's listen to some of her statements. I'm going to play on the screen four clips. The first one starts at 10:10:13 AM. This is the first time that [A.S.] makes a mention of the penis. Please play that clip.
>
> "In the second clip, which begins at approximately 10:20:53, [A.S.] gives a demonstration using an anatomical drawing of where exactly [Scott] put his hand and touched her on her body. And she also makes mention of [Scott] removing her panties and taking them all the way off. Let's listen to that clip.
>
> "In the third clip, which starts at 10:26:43, [A.S.] describes [Scott's] hand going inside her vagina. She describes the defendant removing his clothes, taking his underwear off, her being able to see his penis. Let's listen to that clip.
>
> "In the fourth clip, which starts at 10:40:28, [A.S.] gives *an uncanny description* of a man masturbating to the point of ejaculation *considering her tender age*. She describes the shaking up of the penis, the ejaculation or milk coming out of the penis, and she describes the milk going onto [Scott's] hand. Let's listen to that clip." (Emphases added.)

Analyzed in context, the prosecutor did not impermissibly opine that A.S. was credible or that her testimony was worthy of belief. Rather, the State simply

31

communicated that it is unusual for a three-year-old girl to be able to provide a detailed description of an adult male masturbating.

Scott directs us to one additional section of the prosecutor's closing argument as support for this claim of error. The precise comments at issue are again shown in italics:

> "Now you are the ones who determine the weight and the credit of the evidence, and you determine its credibility. And it is not for the lawyer to tell you how to do that, but we would ask you some things, and I would ask you, when you watch that interview do you think you are listening to a child who is lying? Do you think you are listening to a child who has made something up?
>
> "*You have heard specifics. Things that we would submit to you, that are so specific for a child of that age they are just simply too specific not to be true.* Talking about being touched on her 'gina[,'] having a finger inserted into her vagina. And most especially, her statements about seeing [Scott] shaking up his penis and then milk coming out.
>
> "Do you think she got that from somewhere else? Do you think she invented that? Or don't you think, looking at all the evidence together, the thing that is more reasonable, that thing that makes the most amount of sense is, this man was alone with this child for the first time in whoever knows, perhaps the very first time ever in his life, but he was certainly alone with her on the 21st." (Emphasis added.)

While prosecutors may offer an explanation of what to look for to assess witness credibility, we recognize "[t]here is a distinction between such proper argument and its improper twin, argument on the prosecutor's personal belief or opinion about a witness' credibility." *State v. Chanthaseng*, 293 Kan. 140, 148, 261 P.3d 889 (2011). But the prosecutor's comments did not cross that line here. Rather, from our analytical viewpoint, this passage simply reflects another instance where the State summarized the evidence and suggested an inference that could be drawn which offered the simplest explanation for that evidence.

We are satisfied that the portions of the prosecutor's closing that Scott challenges as erroneous are properly characterized as fair comments on the evidence which reinforced the jury's role in weighing evidence and determining the credibility of witnesses.

*Inflame the passion and prejudice of the jury*

The second component of Scott's prosecutorial error claim consists of the contention that the State expressly cast his statements to law enforcement in a light that was designed to inflame the passion and prejudice of the jury. Our review again bears out that the context of the argument tells a different story. That is, when viewed in its entirety, the challenged comments simply highlighted remarks Scott made after the incident and informed the jury it could infer consciousness of guilt from Scott's remarks. The statements Scott contends are erroneous are shown in italics below:

> "But the other thing is, just use your common sense and look at that interview again. What do you think [Scott] thought about why he was there talking to Detective Melius? Do you think that the police were accusing him of stealing money from [A.S.'s] college fund? Do you think that he was being accused of some other criminal offense? *Isn't the shame that you see in that interview on* [*Scott's*] *part, the whimpering, the crying, the self pity that you see from* [*Scott*] *indicative of what he knew about what he was accused of? We would submit that it was.*
>
> "Why would [Scott] say, 'I'm going to lose my family over this,' if it were a trivial matter? Why would [Scott] say, '[Jenks] is going to leave me'? Why, in that first call to [Jenks], which is State's Exhibit 25, does he begin that call by saying, '[Jenks], I *fucked up again*'?
>
> "You will recall that testimony from [Jenks] that [Scott] *was having some sex addiction issues*. We would submit that all of this evidence, together in context, indicates [Scott] knew what it was that Detective Melius was going to ask him about. And that is significant because [Scott] hems-and-haws around this to a great extent during that

interview. He makes several statements about, 'There are particulars, but I don't want to reveal them to you, detective.'

"For example, there were times when [Scott] says, 'I know where this is going, that's the dilemma.' 'I don't know how to explain this without incriminating myself.' And these I should say, aren't verbatim quotes, these are paraphrases. 'I know what this is about.' 'I know why I'm here.' 'I'm not a monster, I'm not a criminal.' 'I have really bad lapses in judgment sometimes.'

"*What do you think that that was about? Forgery? I don't want people to think I'm the kind of monster that would forge a check or something. No, in context, based upon all the evidence, you know what that statement means. I'm not a monster who molests children, that's what he's trying to say.*

"'I know I'm going to be in trouble to some degree.' 'There is no way around it.' 'If I'm open with you then I incriminate myself and I'm admitting it.'" (Emphases added.)

Scott argues that the purpose of the comments was to convey to the jury that Scott was a monster. We disagree. To the contrary, the prosecutor fairly illustrated for the jury how it could infer from the evidence adduced at trial that Scott knew what he had done and therefore was aware of what he was accused of.

Lastly, Scott challenges the manner in which the prosecutor discussed the phone call in which Scott admitted he needed help. The final set of challenged statements appear in italics below:

"[Jenks] says, '*You need some help*.'

"He says, '*I'm very aware, and I'm hoping I can get it*.' What does [Scott] need help for?

"In the next call with his mother, at an early point his mother says to him—or, mom says, 'You need mental help and you need to stick with it.'

"Later on in that telephone call she says, 'You need to get through this and get the help you need.' And he says that 'I agree'.

"*What help did he need? What was he referring to?* You see, it's the State's position that just because [Scott] didn't go into specifics doesn't mean that you can't intuit

what the specifics are. [Scott] obviously wanted to avoid specifics because he didn't want to say anything specifically that would incriminate him.

"But *he certainly is acknowledging that he did something so horrible and so horrendous that number one is, he's going to need some help*[,] *mental help—mental health care in order to address it.*

"*And number two, it is so bad he is going to lose his job, his wife, and his children.*" (Emphases added.)

Scott argues that the prosecutor's comments "had no legal relevance or real evidentiary footing," and he disputes the propriety of their terminology, specifically, "'horrible,'" and "'horrendous.'"

The State's use of "horrible" and "horrendous" was a product of its own initiative to establish that Scott's statements reflected his awareness of guilt. Kansas courts have repeatedly held "that in closing argument, a prosecutor may draw reasonable inferences from the evidence but may not comment upon facts outside the evidence." *State v. Hall*, 292 Kan. 841, 848, 257 P.3d 272 (2011). In so doing, a prosecutor is allowed wide latitude in discussing the case with the jury, including "impassioned bursts of oratory" or "picturesque speech" so long as they do not seek to introduce facts that were not disclosed by the evidence. *State v. Rodriguez*, 269 Kan. 633, 643, 8 P.3d 712 (2000). A prosecutor crosses the line of appropriate argument when that argument is intended to inflame the jury's passions or prejudices or when the argument diverts the jury's attention from its duty to decide the case on the evidence and controlling law. *State v. Holt*, 300 Kan. 985, 992, 336 P.3d 312 (2014). Scott does not cite any facts that were outside of the evidence presented at trial, and we are not persuaded that the prosecutor's comments were an impermissible attempt to inflame the passion of the jury and distract it from its obligation to decide the case based on the evidence and the controlling law. The challenged statements were within the bounds of tolerable rhetoric and did not rise to the level of error.

35

*Did cumulative errors deprive Scott of a fair trial?*

Lastly, Scott argues that cumulative error deprived him of his right to a fair trial. Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. *State v. Guebara*, 318 Kan. 458, 483, 544 P.3d 794 (2024).

But the cumulative error rule does not apply when, as here, there are no errors or only a single error. *State v. Lowry*, 317 Kan. 89, 100, 524 P.3d 416 (2023). Accordingly, Scott's claim fails.

*Did the district court err in sentencing Scott?*

Scott asserts that even if this court does not reverse his convictions, his case must nevertheless be remanded to ensure a proper sentencing proceeding is conducted. He contends that the district court abused its discretion when it denied his request for a departure from the statutorily mandated sentence. The State argues that the district court properly reviewed Scott's motion for substantial and compelling reasons to depart and concluded only one reason was truly present but that it did not provide justification for a reduced sentence. Following a careful analysis of the record we are not persuaded that a new sentencing hearing is warranted in Scott's case.

Prior to sentencing, Scott moved for a departure from the term assigned to his off-grid conviction to a grid-based sentence. The district court was not persuaded that Scott's case demanded a departure and imposed the legislatively established Jessica's Law term of life in prison with the possibility of parole after 25 years.

An appellate court will not reverse a district court's denial of a departure from a Jessica's Law sentence unless the district court abused its discretion in holding there was no substantial and compelling reason to depart. *State v. Powell*, 308 Kan. 895, 902, 425 P.3d 309 (2018). As stated previously, judicial action constitutes an abuse of discretion if (1) no reasonable person would agree with the district court's perspective; (2) the decision is founded on a legal error; or (3) it is based on a factual error. Scott, as the party asserting error occurred, bears the burden of establishing that the district court abused its discretion. See *State v. Crosby*, 312 Kan. 630, 635, 479 P.3d 167 (2021).

Scott's convictions for rape and aggravated indecent liberties with a child are classified as Jessica's Law offenses. Those crimes are off-grid offenses and carry a sentence of life imprisonment with a mandatory minimum term of not less than 25 years or, if previously convicted of a similar crime, a minimum of 40 years. K.S.A. 21-6627(a), (b). However, Jessica's Law also includes a provision which permits sentencing courts, upon the finding of substantial and compelling reasons, to depart to the sentencing guidelines grid for first-time offenders. K.S.A. 21-6627(d).

Scott contends the district court's decision was unreasonable given that he outlined six substantial and compelling reasons as justification for imposition of a more lenient term. Those factors included: (1) his lack of criminal history, (2) his laudable employment history, (3) the offense was an isolated incident and out of character for him, (4) he is amenable to treatment, (5) he poses only an average risk of reoffending, and (6) incarceration does not guarantee a decrease in recidivism for sex offenders.

The record before us reflects that once the parties articulated their respective sentencing recommendations, the district court honored Scott's right to allocution and then addressed each of the six proposed departure factors and advised it viewed only one, Scott's amenability to treatment, as an actual mitigating circumstance. Nevertheless, it was not persuaded that factor cleared the threshold for a substantial and compelling

37

reason to depart. Accordingly, Scott's request for a grid sentence in lieu of the Jessica's Law term was denied.

The Kansas Supreme Court has interpreted the term "substantial" as used in this context to mean "'something that is real, not imagined, and of substance, not ephemeral.'" *State v. Galloway*, 316 Kan. 471, 476, 518 P.3d 399 (2022). And a compelling reason "'is one that forces a court—by the case's facts—to abandon the status quo and venture beyond the presumptive sentence.'" 316 Kan. at 476.

On appeal, Scott essentially details each of those six points for us again. But he fails to favor us with any argument which establishes *why* those factors demanded imposition of a shorter prison term in his case. The mere fact circumstances exist which could have allowed for a departure sentence does not render the district court's decision unreasonable. To the contrary, as the Kansas Supreme Court has repeatedly found, "the presence of mitigating factors does not require a sentencing judge to impose a lesser sentence." *State v. Fowler*, 315 Kan. 335, 339, 508 P.3d 347 (2022) (collecting cases).

The arguments presented by Scott do not establish that his case is "'extraordinary.'" See *State v. Brown*, 305 Kan. 674, 697, 387 P.3d 835 (2017) (quoting *State v. Eisele*, 262 Kan. 80, 90, 936 P.2d 742 [1997]). Thus, a reasonable person could agree with the district court that nothing Scott presented compelled the court to abandon the status quo and venture beyond the legislatively mandated sentence. See *Galloway*, 316 Kan. at 476-77. The district court's denial of Scott's motion for departure and the sentences imposed are affirmed.

Affirmed.